In re LOS ANGELES LUMBER
PRODUCTS CO., Ltd.

No. 31352.

District Court, S. D. California, Central
Division.

June 29, 1942.

See, also, 37 F.Supp. 708, and 46 F.
Supp. 77.

Stuart L. Lapp, and J. C. Macfarland,
both of Los Angeles, Cal., for debtor and
L. A. Shipbuilding & Drydock Corpora-
tion.

Warren E. Libby, of Los Angeles, Cal.,
for Bondholders' Committee and another.

· William W. Clary, of Los Angeles, Cal.,
for David R. Faries, and others.

Charles F. Johnson, of Los Angeles,
Cal., for Securities and Exchange Commis-
sion.

JENNEY, District Judge.

This matter is now before the court upon
debtor's petition to compromise the claims
of David R. Faries and District Bond Com-
pany, regularly filed, in the total principal
sum of $266,000, and the application of
Faries & McDowell for attorneys' fees in
the sum of $31,415. These matters have
been the subject of written opinions by this

court, which are of record, dated February 8, 1941, and September 29, 1941, respectively.

The court has reviewed both of these decisions, and feels that, predicated upon the testimony in the record, each of said decisions is correct in all particulars. That does not mean that another judge or other judges might not reach, in part at least, different conclusions.

On February 19, 1940, a so-called bondholders' committee and Helen A. Cameron, a bondholder, represented by Warren E. Libby, as attorney, filed a petition asking for cancellation of certain bonds held by David R. Faries in trust for the debtor, for determination of the classification of claim for cost or value thereof and for an accounting by officers of the debtor in possession. The District Bond Company was not mentioned in that petition. On March 7, 1940, David R. Faries filed an answer to the bondholders' petition, and subsequently, a supplemental answer.

On January 23, 1941, a petition was filed for an order to show cause directed against Mr. Faries and the District Bond Company and its subsidiaries. Further proceedings on both petitions were had and hearings were held before another judge, Judge Fee of Portland, Oregon, during the absence from the bench of this court due to illness.

Judge Fee made his decision in the matter. Subsequently Messrs. O'Melveny & Myers were substituted as counsel for Mr. Faries and the District Bond Company. Many months thereafter, incident to the settlement of the findings of fact and the form of judgment, in connection with the Judge Fee hearing, counsel who had been substituted as attorneys for the claimants raised the point that the bondholders' committee and the debtor had failed to properly make District Bond Company a party to the proceedings in such a way as to give that corporation its full day in court upon its bond claim. This error, in the judgment of the court, made it necessary to reopen the litigation for additional hearings, even though there was a strong possibility that these reopened hearings might be extensive.

Just as these hearings got under way, and after months of negotiation, a compromise settlement was proposed, not only of the Faries and District Bond claims, but also the attorneys' fee application of Messrs. Faries & McDowell, which had been the subject of a previous written opinion by this court, dated February 8, 1941, in which the court declined to allow any amount of this application of $31,415.

The proposed compromise was approved by resolution of the board of directors of the debtor and a formal petition was filed by its counsel, asking this court likewise to approve the compromise. Copies of this petition and notice of the time, place and purpose of the hearing were sent to all of the bondholders by mail. In that connection written objections were directed to be sent to the judge prior to the hearing.

During the period of time elapsing between the mailing of the notice of the hearing and the actual hearing thereof, the court received dozens of letters and telephone calls urging the court to approve the compromise. No letters or telephone messages were received from bondholders or others in opposition to the proposed compromise settlement. Attorney Warren E. Libby filed formal objections in writing on behalf of the bondholders' committee and Mrs. Cameron, and the Securities and Exchange Commission likewise filed formal written objections.

At the time of the formal hearing in open court, which occurred on June 8, 1942, opportunity was given to all interested parties to present their views. Many stockholders, who are, of course, the former bondholders, and, therefore, claimants, spoke in favor of the proposal. Mr. Libby appeared and spoke in opposition as the representative of the bondholders' committee and Mrs. Cameron, but not a single individual bondholder spoke against the proposal. As a matter of fact, the court received a number of communications from bondholders who claimed formerly to have been members of the bondholders' committee but who were now in favor of accepting the proposed compromise.

Due to the pendency of a criminal case before this court on the day of the hearing, the hearing was continued, upon order, to June 19, 1942, to be heard before a Special Master, Reuben G. Hunt, who had acted on a number of occasions as Special Master in this case, and the testimony of that hearing has been transcribed, submitted by the Special Master without recommendation to this court, and has been carefully studied.

No judge can live as intimately with any case, for so many months and years, as has this court, without knowing a lot about it. The taking of extended testimony was hardly necessary. The judge, if he is handling

such a bankrupt estate conscientiously, should know more about questions of general policy than anyone and should have a pretty good grasp of all of the problems of administration and operation. However, we have taken all the testimony offered and have received expressions of opinion from those who have carefully followed the course of the proceedings and who are well informed.

It has been said many times: "A poor settlement is better than a good law suit," and "ordinarily the only ones who make any profit out of a law suit are the lawyers."

Let us see, as practical men, just what is involved here. As I have said before, this is not a private fight between Mr. Stelle, chairman of the bondholders' committee, and Mr. Faries. It is a matter between the debtor and its creditors, the claimants, in which all bondholders are naturally interested. A compromise means, by its very nature, a "give and take," that is, concessions by both sides. An obstinate setting of the jaw, or pride of opinion, have no place in a compromise settlement of any controversy. What every interested party should seek is a settlement which is fair and feasible.

Now, just what is the situation here? Assuming, for the purpose of an analysis of the problem, that this court's opinion is 100% correct, and that it will ultimately be affirmed by the Circuit Court of Appeals and the Supreme Court of the United States, the claimants, Mr. Faries and District Bond Company, would receive approximately 28,500 shares of the debtor's capital stock, which includes the court's original allowance of approximately 27,500 shares, plus an allowance for interest. I shall not try to be too exact. This is largely an extemporaneous statement of the present situation, and exactitude in dollars and cents and number of shares might be confusing, but the figures that I carry in my mind and on my notes are substantially correct. You gentlemen know the exact figures as well as I do. Let us, for the purposes of this discussion, consider the value of the shares to be $2.50 a share, which is possibly a trifle high. Some shares, of course, have sold for more, and some of them have sold for less. You can adjust the figures up or down, depending upon whether you think that figure is too high or too low. But at $2.50 a share, if Mr. Faries and

the District Bond received 28,500 shares, they would receive stock of the approximate market value of $71,250.00. If the claimants received the full amount of their claim as filed, they would receive 90,440 shares. Deducting the amount of the Borbridge bond and allowing no interest on the Faries and District Bond claim, we would have, at a valuation of $2.50 a share, a market value of shares of approximately $226,100.00. Now, if Mr. Faries' law firm of Faries & McDowell were also to be granted its application for attorneys' fees in the amount of $31,415.-00, without considering interest on that amount, these claimants would receive a total in value of $257,515.00.

Under the compromise offered, which is now before the court, Mr. Faries' firm would receive no part of the attorneys' fee claimed of $31,415.00, and the court's opinion in this regard would become final; nor would they receive any interest on any amount of attorneys' fees allowed, but Mr. Faries and the District Bond would receive 46,000 shares of stock, which, at a value of $2.50 a share, would amount to $115,000.00. This is approximately $142,-515.00 less than the full amount of their claim, including the law firm's attorneys' fees, but without considering all accumulated interest.

You understand, gentlemen, that attorneys' fees and expenses are called administrative expenses and they must be paid in cash. They may not be settled by issuing stock, as is the case with bondholders' claims under the plan of reorganization.

As I understand it, Mr. Libby and the bondholders' committee, and his client Mrs. Cameron, are willing to allow claimants a total of approximately 32,500 shares, which would make a market value, at $2.50 a share, of approximately $81,250.00. In that figure there is an allowance of a concession of approximately $10,000.00— that is, 4,000 shares, as "nuisance value." By "nuisance value," they seem to mean that it would cost debtor corporation $10,-000.00 to successfully fight the claim. In other words, they propose to allow claimants 4,000 additional shares of stock, above what the court allowed them in his opinion of September 29, 1941, at $2.50 per share, instead of permitting the debtor to incur that amount of cash obligation for attorneys' fees and expenses.

The court has had considerable experience with charges for attorneys' fees and other expenses involved, not only in this litigation but litigation of a similar nature. The court is satisfied that the actual cost would be much in excess of $10,000.00 and, in fact, might easily be several times that amount. While I think $50,000.00 would probably be more nearly correct than $10,000.00, even on the basis of $10,000.00, the difference in market value of the stock, which would be received under the compromise and under the arrangement satisfactory to the bondholders' committee, is $33,750.00. That is only about one and two-thirds per cent of the total outstanding stock, considering the amount allowed on the compromise. And, at that, this amount is not to be paid in cash; it is to be paid in the stock of the corporation, and the amount of outstanding stock, as I say, will be increased such a small percentage as to have comparatively little effect upon each 100-share lot owned. If we go through with this entire litigation and the claimants are successful, i. e., if this court's decisions are all reversed, claimants will, as I have indicated, receive, roughly, $257,515.00 in value, so that the extra amount, either in cash or in stock, which the corporation would then have to deliver to claimants would be, roughly, $111,100.00, in stock, $31,415.00 in cash, and added to that would be anywhere from $10,000.00 to $50,000.00 in cash, for costs and expenses in fighting the litigation; and I am satisfied that the cost would be much closer to the higher, than to the lower, figure. That, gentlemen, is substantially the picture. To save $33,750.00 in stock to be issued, the debtor would be hazarding a possible $111,100.00 in stock and possibly an amount in cash running from a minimum of $41,415.00 to $81,415.00.

I want to call your attention, also, to the fact that this pending litigation is the only substantial matter, so far as I know, which stands in the way of closing this estate and getting it out of this court; thus permitting those who own the corporation to take it over and run it. So long as this corporation stays in court, there is bound to be a very considerable cost, running into thousands of dollars every year, I am satisfied, for extra services of attorneys and paid executive officers made necessary by constant conferences and applications to, and hearings before, the court on administrative and other matters. This very considerable item of expense has not been taken into consideration in the figures which I have given to you.

Another element from a business angle is entitled to serious consideration. Every dollar paid out in attorneys' fees and expenses has to be taken out of net profits of the debtor after taxes. You lawyers and businessmen can take your pencils and figure out how much more in taxes of this corporation is going to be necessary, in order to pay attorneys' fees and expenses. As I have said several times, the actual amount that will have to be paid in this regard may greatly exceed the minimum limits.

█ Let me discuss this matter a little, very frankly, from a legal standpoint. As I have said, with the information available at the time, it is my considered judgment that my former opinion was correct, and it must be definitely understood that I am not receding in the least from the legal principles there enunciated. It is my firm conviction that the directors of a debtor in possession, under Section 77B, 11 U.S.C.A. § 207 or under Chapter X, 11 U.S.C.A. § 501 et seq. have a responsibility which is not to be measured by the decisions which indicate the responsibility of directors of an ordinary corporation. I do not recede from that position one particle. However, claimants represent that they have evidence which was not introduced at the prior hearing, and which might have an important and material bearing upon the matter. (I may say, parenthetically, that I have good reason to believe that this statement is correct. This additional evidence is, however, not now before this court and I have not permitted that representation to influence my judgment in any way.) However, it may well be that this additional evidence, when produced, might be sufficient to compel a revision of this opinion of mine on the claim, particularly with regard to the District Bond claim. It is quite possible, also, that such additional evidence might, to some extent at least, change the court's ruling as to the so-called "Spicer bonds." However, it would serve no good purpose for me to go into that at this time, nor do I think that it would serve any good purpose to go into the question of whether or not there was double punishment or a double penalty imposed. Suffice

it to say that I do not feel that such a double punishment was imposed, or that that argument is sound.

Now, particularly as to the claim of District Bond, we are, from a legal standpoint, entering a new field. The law is not well settled and it is easily possible that other judges might disagree with the conclusions of this court. If it had been cut and dried it would not have required me to read several hundred decisions and thousands of pages of briefs. In considering the desirability of a compromise settlement, these possible hazards are of the utmost importance. Expedition, no matter how desirable, must, of course, give way to fairness. However, does it seem fair, in arriving at a settlement, to allow to claimants what we consider to be the very minimum of debtor's probable expense of $10,000.00 and to pay that in stock, and completely ignore the fact that the debtor corporation might conceivably be liable, if the case goes against it on appeal, not just for $10,000.00 in expenses, but for a possible $111,100.00 worth of stock and, in addition to the $10,000.00, a possible $31,415.00 and a possible $81,415.00 in cash, for attorneys' fees and expenses?

We should not lose sight of another element in connection with this entire matter. If the compromise is accepted and no appeal is taken, this proceeding can be terminated in a very short time and the management of the corporation delivered over to the people who have the financial interest in it, that is, the former bondholders who are now the stockholders. They can elect their board of directors and thus control the appointment of executive managers. It is not fair to them to have men operating the company—no matter how efficiently—who have almost no financial interest in the corporation. Nor is it fair to anyone to keep this proceeding in court for years. The Congress certainly had no such intention when it passed either Section 77B or Chapter X. Clearly, what the Congress was trying to get away from were these long, cumbersome and expensive equity receiverships. This proceeding reminds us of those. Congress certainly didn't contemplate that a United States District Judge should be responsible for supervision and that busy conscientious businessmen, with successful businesses of their own, should be made responsible for years of operations of a corporation, and for deciding permanent matters of corporate policy, while rival interests fought out their personal animosities or battled for control.

This corporation is being operated by a board of directors who are acting as trustees under this court. They have done a fine job, but they are faced now with many problems which only the actual owners may properly, it seems to me, solve. Operations have grown from those of a small repair plant to a tremendous shipbuilding company with more than a hundred million dollars in shipbuilding contracts. The government needs ships badly. The navy is urging further expansion. To what extent may expansion be further permitted? Should the plant be contracted to a repair yard as formerly after the war is over? In general, what is going to happen to the plant after the war terminates? What safeguards must be thrown up for the protection of the stockholders? What temporary or permanent arrangements should be made with labor?

We have recently had a most difficult situation. Captain Court, the executive head of the business, has just resigned. Captain Barnett, who has been with the corporation only a few months, has been temporarily appointed to take his place. Neither the directors, as trustees, nor the court feel that they have a right to tie these stockholders up to a long-term contract with a new chief executive. Such a commitment should be made only by the real parties in interest. I need not dwell upon the disadvantages of such a situation, nor need I more than suggest how impossible of permanent solution is that situation while the corporation is in the bankruptcy court.

Let us put it another way: The stockholders should be making their own decisions, as to both short and long term policies, through their duly elected directors and officers. The Navy Department and other departments of the government should be in a position to deal directly with the owners. There is much criticism of the profit margins on army and navy contracts. Should the responsibility for cutting this profit margin to the quick or taking contracts at a smaller profit margin, or even at a loss, in order to compensate for other contracts with a large profit margin, be placed upon this court and its trustees? The answer to that question seems obvious.

We can have no absolute assurance, of course, as has been urged by counsel, that the new management can carry on this business more efficiently in the future than can the court and its trustees. No one can answer that question with certainty. All we can possibly do is to use our best judgment as reasonable and highly trained men with a wide background of experience. That training and that experience tells us that the corporation will, under ordinary circumstances, be much more efficiently operated by those who own it. There is a lot of difference between theory and practice; but that certainly is nothing but common experience.

Nor do we feel that the law and the decisions are such that we may proceed with an election of new directors at a legally held stockholders' meeting, under existing conditions and under existing circumstances, without every probability of protracted litigation. All of which will but add to the uncertainty, legal expense and delay.

The objection is made that even if the compromise is accepted there is no assurance that there will be no appeal. True! But an approved compromise leaves a simple and clean-cut question on appeal, which, under ordinary circumstances, may be decided expeditiously by the Circuit Court of Appeals.

Each side seems to feel that the other has been guilty of dilatory tactics. That is but natural in a complicated matter such as this. Attorneys for each side must, in all fairness to the position of their clients, raise every possible hurdle. That ordinarily means, and it certainly has meant in this case, many hearings, many pleadings, lengthy briefs and protracted oral and written arguments. However, we cannot help but call attention to the fact that this Faries and District Bond claim matter would surely have been over many months ago, and the decision of this court would either have become final or the matter would now be on appeal before the Circuit Court of Appeals, or actually decided by that court, had District Bond Company been made, definitely, a party to the proceedings so that no question could have been raised on that point.

■ In these bankruptcy proceedings the court has a heavy burden of responsibility, from a moral, legal and business standpoint, certainly much heavier than is the case of an ordinary bankruptcy, where there are two ordinary parties litigant. In a proceeding such as this, creditors have a right to expect the judge to draw upon his years of training and experience in guiding the affairs of the bankrupt estate. The judge functions both as a judicial and an administrative officer. In determining whether or not a compromise is indicated, the court must look at every phase of the question presented—not merely the strictly legal aspects of the matter. He should have no pride of opinion. It is but natural for a judge to wish to have his legal opinions on important matters sustained by the Circuit Court of Appeals and by the Supreme Court of the United States; but he certainly must not permit that natural inclination to interfere with his judgment nor blind his view of the full picture. An offer of compromise ordinarily presents but one problem: Is a compromise settlement for the best interests of the bankrupt estate? In determining that question the court must consider all the evidence, including the mass of information which has come to him in the intimate handling of the business of the debtor corporation.

■ Expediency and the court's duty to clear his calendar so that other litigants may have his time and attention properly may be given no consideration. The court must be ready and willing to give to each matter, brought before him, such attention as it may reasonably require. Nor must we give too much weight to the almost overwhelming preponderance of sentiment in favor of the compromise. In a case decided by this court In re Peppers Fruit Co., D.C., 24 F.Supp. 119, 122, which was a straight bankruptcy proceeding, this court said:

"It is also possible that the Referee felt that the compromise should be made because it bore the approval of such an overwhelming amount and number of claims of creditors.

"While these factors are, of course, most important, this court is of the opinion that in these compromise matters, where objection is made, even by only a small creditor, substantial evidence should be produced by the opposing parties in order that the Referee may carefully consider the merits or demerits of the proposed compromise. It is the duty of the referee to discourage litigation on behalf of the estate involving delay and expense, unless a substantial legal basis appears for the litigation and there

seems a likelihood of substantial ultimate benefit to the estate in the event of a favorable judgment. On the other hand, it is equally the duty of the Referee to encourage litigation which appears to have a reasonable chance, without undue delay and expense, of bringing assets into the estate or protecting the assets already in the estate, or reducing the amount of the several classes of claims required to be considered upon distribution. In re Meadows, Williams & Co., D.C.N.Y., 181 F. 911, 25 A.B.R. 100; Billings v. [Charles] Millar & Son Co., D.C.N.Y., 227 F. 185, 35 A.B.R. 846."

The conclusions which I arrived at in the Peppers Fruit case are just as sound in this proceeding. The criterion is and must always be the "substantial ultimate benefit to the estate," and in that regard the views of men, disinterested and impartial, who have had broad experience and a close connection with the affairs of the debtor for many months must be given respectful consideration; and some deference should also be paid to the business judgment of those whose financial interests are at stake.

I might say that the resolution approving the filing of the petition was not unanimous. Director McFie was the only one who voted against it. Director Simpson was not present. They have both indicated to me that they felt that this was not a matter which should be disposed of by the directors, but should be disposed of by the court.

In the presentation of this matter, some reference has been made to the offer of compromise made by claimants in July, 1941 —nearly a year ago. At that time debtor presented its petition to this court, which was unanimously approved by its directors, and asked that a compromise settlement of the same controversy be made by delivering to claimants 58,140 shares of stock, which was 12,140 shares of stock more than is involved in the present offer of compromise. The then directors were identical with the present directors. However, it must be borne in mind that at the time this petition was filed the court had not rendered its opinion of September 29, 1941, drastically cutting down the Faries-District Bond claims. This court denied the petition and rejected the proposed compromise. Why? Because at that time the court had definitely made up its mind what its decision in regard to those claims must be under the law and the facts, as they then appeared, and did not feel that the proposed compromise was fair to debtor. The directors could not be informed of what was in the court's mind until the opinion was finally handed down on September 29 of that year, which was two or three months later.

In this connection, we must keep in mind the fact that many things have happened during the past eleven or twelve months. We were then not at war and there was not the particular pressure from the standpoint of patriotism, to clear the decks and get ready for any action which the national welfare and safety might indicate. Then, again, at that time there was not any suggestion of irregularity in the proceedings contesting these claims. Nor had the question been raised that the District Bond Company had not had its full day in court.

The court has given this entire matter literally months of consideration and has come to the conclusion that, under the circumstances, the compromise settlement proposed by claimants and accepted at a meeting of its board of directors held on May 13, 1942, is fair and that it is to the best interests of the stockholders of the corporation, which are the former bondholders, that the compromise offer be accepted.

It Is Therefore Ordered that debtor's said petition of May 20, 1942, be and the same is hereby granted; and that the compromise as set forth in said petition be and the same is hereby approved.

Counsel for debtor will prepare and cause to be executed such agreements between the parties as may be necessary or advisable to carry out the provisions of said compromise agreement. It is the suggestion of the court that a stockholders meeting for the election of directors be held as soon as is reasonably possible; also, that such steps as may be necessary be taken, expeditiously, to close this estate and dismiss these proceedings.

So ordered.