### In re AUTOMATIC EQUIPMENT MFG. CO.

No. B–3–50.

United States District Court
D. Nebraska, Omaha Division.
Sept. 4, 1952.

See also, 103 F.Supp. 427.

R. B. Hamer and James W. R. Brown, Omaha, Neb., and G. J. McGinley, Ogallala, Neb., for claimants, R. A. Goodall and C. M. Goodall.

Charles S. Reed and William A. Sawtell, Jr., Omaha, Neb., for Automatic Equipment Mfg. Corp., Sole Stockholder.

Raymond M. Crossman, Omaha, Neb., for the Trustees, Raymond M. Crossman, Jr. and Russell W. Bartels.

DONOHOE, Chief Judge.

This is a corporate reorganization proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.; and the court is presently concerned with the allowableness and classification of certain claims against the debtor corporation which are held by R. A. Goodall and C. M. Goodall, a copartnership. In its application for the allowance of claims and classification of creditors and stockholders, filed April 25, 1952, (File No. 149), the sole stockholder of the debtor corporation objected to the allowance of the Goodall claims. The court notices that the sole stockholder acquired all the outstanding stock of the debtor corporation in October of 1951, over a year and a half after the institution of this reorganization proceeding. The consideration given for, and the circumstances surrounding the acquisition of, the debtor's stock do not appear of record. However, in view of the

objection by a party in interest, and in keeping with Section 196 of the Bankruptcy Act, 11 U.S.C.A. § 596, the court held an extended hearing on the Goodall claims the 23rd, 28th and 29th days of May, 1952. Careful consideration of the properly admissible evidence adduced at this hearing discloses the following

## Material Facts:

On January 20, 1950, a petition for reorganization of the Automatic Equipment Manufacturing Company was filed in this court. At the time this petition was filed the Goodall partnership did not have any claims against the debtor corporation. The petition was approved and the debtor continued in possession of its assets. On February 3, 1950, an order was entered permitting the debtor to submit, and solicit acceptance of, a proposed plan of reorganization. The manager of the company, Mr. Russell Bartels, prepared and circulated a plan, a copy of which was filed in this court on March 6, 1950.

On March 17, 1950, the debtor corporation filed schedules setting forth the company's assets and liabilities. These schedules, which were sworn to, and subscribed by, the secretary-treasurer of the company, Douglas S. McQuistan, contain a list of the outstanding creditors of the debtor corporation, including in Schedule A–3 (File No. 10) the names, addresses, and the amount owed to each of the general creditors holding unsecured claims. With a few exceptions, this schedule contained the names of all the creditors whose claims were thereafter acquired by the Goodall partnership.

The reorganization plan circulated by Mr. Bartels on behalf of the debtor was evidently unsatisfactory because on March 17, 1950, certain creditors filed objections to the plan and also objections to the continuance of the debtor in possession. Consequently on March 20, 1950, the court appointed Raymond Crossman, Jr., an Omaha attorney, and Russell Bartels, as co-trustees to take possession of and operate the debtor, Automatic Equipment Manufacturing Company, during this reorganization proceeding.

March 31, 1950, upon the application of the trustees, the court approved the employ-ment of W. D. Messenger, a certified public accountant, "for the purpose of assisting (the trustees) in performing the duties imposed upon them under Chapter (X)" of the Bankruptcy Act. Messenger did not solicit this employment but was contacted by Bartels, who, by reason of previous experience, believed Messenger to be competent and qualified to do the accounting work required. At the time of his employment by the trustees, Messenger had offices in Lincoln, Nebraska, and served a clientele throughout the state. Included especially, but not solely, within Messenger's clientele where the Mapes Company of Lincoln, Nebraska, and R. A. Goodall of Ogallala, Nebraska. Messenger had served the latter of these clients for at least two years preceding the institution of this proceeding.

By an order entered April 27, 1950, the court fixed the time and prescribed the manner for the filing and allowance of claims. All claims had to be filed by June 27, 1950.

Messenger began his audit of the debtor's records sometime after March 20, 1950. While he was engaged in examining the company's books, he was requested by Bartels to assist the trustees in interesting someone in the reorganization proceedings. The creditors were being represented individually. No creditors committees had been formed and no plan of reorganization had been submitted on behalf of any of the creditors. This seemed to disturb Bartels who with Messenger discussed the fact that

"* * * about the only way anybody would get anything done would be for somebody to get enough claims that had an interest in it and try and get something under way for reorganization."

Bartels believed that it would be to the advantage of the debtor corporation and the trustees in the administration of their trust, if the claims of the creditors were acquired by one, or others with whom he could deal, "instead of the total number of individual creditors." Bartels conferred with Messenger in regard to interesting some of his clients in the debtor corporation; and in turn Messenger suggested to Mapes, the Lincoln client, that he take a

look at the Automatic Equipment Manufacturing Company plant and then contact Bartels for the purpose of securing further information.

By a letter dated August 8, 1950, Messenger forwarded to the trustees a complete report of the debtor's financial condition as disclosed by his first audit which included an examination of the company's books and records for the period beginning January 1, 1949, and ending March 31, 1950, and a review of the books and records for prior years insofar as the auditor deemed necessary. There is no evidence that Messenger's audit was in any respect false or fraudulent, or that by reason of non-disclosure it failed to fully, fairly and accurately reflect the condition of the debtor corporation during the period covered. On the contrary, the report is very perspicuous and detailed and exhibits the excellence of accounting skill that was necessary for its preparation. Without becoming unnecessarily prolix the court would like to call attention to certain salient portions of the report. The balance sheet of the debtor corporation for March 31, 1950, as shown by the report may be epitomized as follows:

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Current | $166,688.53 | | Current | $218,062.32 | |
| Fixed | 148,528.38 | | Other | 2,754.90 | |
| Other | 9,929.25 | | | | $220,817.22 |
| | | $325,146.16 | | | |
| | | | Net Worth | | |
| | | | Capital Stock | $ 25,025.00 | |
| | | | Surplus | 79,303.94 | |
| | | | | | $104,328.94 |
| | | $325,146.16 | | | $325,146.16 |

Although the books of the company revealed that its total assets were not exceeded by its liabilities, it is clear that the current or liquid assets were insufficient to satisfy the current liabilities. Messenger emphasized this fact with the following comment which appears at page 14 of his report (File No. 57):

"The present financial condition can be attributed to several factors, primarily perhaps, to imprudent financing of expansion without the use of long-term credit thus jeopardizing the working capital to such an extent that the liquid position became untenable. This position was further intensified by virtually ignoring the proper reporting and accrual of federal income taxes in order that the expansion program might be accomplished. When additional assessments were levied by the Treasury Department the company was not in a cash position to liquidate these liabilities."

This analysis is, of course, borne out by the record. The immediate cause for petitioner's institution of this proceeding under Chapter X of the Bankruptcy Act was the seizure of the debtor's assets by the Collector of Internal Revenue under a distress for the payment of federal taxes; and one of the remaining obstacles to the successful reorganization of the debtor is the present lack of available cash, or the means of acquiring it, for the satisfaction of the Government's tax claim.

Messenger's report also shows that the debtor had a $22,416.69 loss from operations during the year 1949, and that a certain consumer resistance to the debtor's products had developed in the early months of 1950. However, it was his opinion that the corporation could be rehabilitated with a further investment of capital and sound management, which his report shows had been lacking in previous years.

Subsequent to the time that Messenger transmitted this first audit to the trustees,

but prior to the time that they filed it in this proceeding, Mapes of Lincoln, Nebraska, began acquiring the claims of various unsecured creditors. Between September 7, 1950, and September 21, 1950, Mapes acquired 27 claims against the debtor corporation in the face amount of $22,917.33 for the sum of $4,602.18. Both Bartels and Messenger knew that Mapes was acquiring these claims at considerable discount. However, Messenger, who had been employed by Mapes for other matters, did not advise him in connection with these claims, nor did he solicit or call upon any creditors who assigned their claims to Mapes.

At approximately the same time that Mapes was acquiring claims against the debtor, the trustees were having Messenger's first audit printed and prepared for circulation to the creditors; and by September 30, 1950, all the creditors had notice of Messenger's audit. For on this date the trustees filed in this proceeding the audit, and their comments on it, together with an undated letter which had evidently been transmitted to the creditors along with the audit and trustees' comments. The letter reads as follows:

"Dear Creditor:

"Enclosed herewith you will find a complete report of the affairs of the Automatic Equipment Manufacturing Company, as prepared by W. D. Messenger Certified Public Accountant. In addition thereto, are some comments prepared by the trustees. You will note this report shows that the company is not in fact insolvent, that its assets exceed its liabilities, and that there is a substantial net worth.

"You will also observe, that the company has very little cash, and you will recognize the need for working capital if its sales volume is to be built up. You will also recognize the Collector of Internal Revenue and other taxing agencies have a priority so far as the collection of their claim is concerned. Therefore, it seems to the writers that a plan of reorganization must be prepared and adopted. Such a plan would necessarily contemplate the following:

"1. The postponement of the payment of creditors claims.

2. Possible change in the form of the creditors claims to participation.

3. Refinancing the tax liens.

4. Obtaining working capital.

5. Management revision.

"Automatic Equipment Manufacturing Company possesses a most unusual set of tools and equipment. Its facility is not to be duplicated anywhere in this immediate area. This facility is being used at a very small percentage of capacity. Your trustees feel that this is a natural set-up for a defense contract, and have been, and are endeavoring to obtain a defense contract.

"Your trustees are likewise, endeavoring to find an industrialist who would be interested in acquiring the entire facility. If the entire plant could be sold, creditors would naturally be paid.

"If you, as a creditor, have any information which would be helpful in obtaining a prospective purchaser or in obtaining a contract or sub-contract, the trustees would appreciate it if you would forward the information immediately. If you have any comments which you would care to make, in connection with the formulation of a plan of reorganization, your trustees, will be very glad to study these comments and to aid in any way possible in connection with the formulation of a plan to be submitted to the creditors.

"Respectfully submitted.

Raymond Crossman, Jr.

Russell W. Bartels

Trustees."

This letter is indicative of the fact that at this time (approximately the 30th of September, 1950) the trustees were advising the creditors that the debtor was in good financial condition. There is no evidence that the trustees were recommending, persuading or even suggesting that the creditors dispose of or assign their claims for less than face value; and it may reasonably be inferred that the circulation of

the foregoing letter with the auditor's report would deter, rather than encourage, such disposition of claims by creditors at a discount.

Because of ill-health and certain financial obstacles Mapes lost interest in the debtor corporation and made no effort to acquire more claims after September 27, 1950. When Messenger became aware of this he discussed it with Bartels and suggested that R. A. Goodall of Ogallala, Nebraska, might be interested. Shortly prior to the 23rd of October, 1950, Messenger contacted Goodall and referred him to Bartels for the purpose of acquiring information about the debtor company. At this time Bartels knew that Messenger was employed as Goodall's business adviser and Goodall knew that Messenger was employed as auditor for the trustees. It seems appropriate to mention that Messenger did not contact Goodall until approximately three weeks subsequent to the time that Messenger's first report, which contained a complete list of all the creditors of the debtor corporation, had, by its filing in this proceeding, become a matter of public record.

Between the dates of December 4, 1950, and May 24, 1951, Messenger, acting in the interest of, and as agent for Goodall acquired 14 claims against the debtor corporation in the face amount of $29,382.52, for the sum of $9,428.86. It is apparent from the face of each claim that it was assigned by the creditor to Messenger in the first instance and then reassigned by Messenger to Goodall. The assignments were made in this manner at Bartels' suggestion so that it would be clear to everyone what had transpired. Thus, it appears that Bartels not only knew that Messenger was acquiring claims for Goodall, but even assisted in preparing the formal assignment for some of the claims. With one exception, all of the creditors, who assigned a claim in the first instance to Messenger, were advised, and knew, that Messenger was purchasing the claims for Goodall; and Messenger in purchasing the claims used Goodall's funds.

Sometime in February, 1951, Goodall started soliciting claims of general credi-tors directly. By August 9, 1951, Goodall, either directly, or through his organization, had acquired 27 claims (not including those acquired by Messenger) having a face value of $10,918.50, for the sum of $2,188.06. Three of these claims, having a total face value of $5,283.94, were held by Socony Vacuum, Deep Rock Oil, and Rohm and Haas, companies which had been contacted by Messenger sometime prior to their solicitation by Goodall. Messenger had not been successful in persuading these claimants to make assignments and consequently suspended his efforts in that regard; and neither these three, nor any of the 27 claims, were assigned as a result of Messenger's solicitation.

While Goodall was soliciting the 27 claims mentioned above, he was also negotiating an assignment of the claims held by Mapes; and on April 14, 1951, in Messenger's office in Lincoln, Nebraska, Mapes assigned his claims, having a face value of $22,977.13, to Goodall for the sum of $6,903.27. The acquisition of these claims was discussed directly by Goodall with Mapes and the assignment, of course, ran directly from Mapes to Goodall.

All in all the Goodall partnership has acquired 68 claims having a face value of $63,278.15 for the sum of $18,520.19. Messenger did not invest in, and does not have any direct financial interest in any of these claims. It is clear from Goodall's testimony that he discussed the acquisition of all of these claims with Messenger. However, there is no evidence that Messenger had any confidential information concerning the debtor, or that if he had any, that he disclosed it in discussions with Goodall.

During the time that Goodall was acquiring claims against the debtor corporation Messenger continued his employment as auditor for the trustees. On June 11, 1951, he transmitted to the trustees, his second report, covering the calendar year 1950. This report was filed by the trustees June 21, 1951. The report which shows a net loss of over $58,000 for the year 1950, was in all respects as capably prepared as the earlier report. The loss for the year 1950 naturally diminished in a substantial degree the company's net worth. In con-

nection with the Goodall claims the court calls attention to page 11 of Messenger's second report (File No. 114) wherein the following comment is made:

"The trustees have been active in their efforts to secure a reorganization of this company and have been able to interest certain outside interests to the extent that the claims of a considerable portion have been purchased by such parties.

\*  \*  \*  \*  \*  \*

"The auditor preparing this report has likewise been active in his attempts to effect a reorganization but had no financial interest in the company during the period covered by the report."

Although this audit for the calendar year 1950 is the last one prepared by Messenger and filed in this proceeding, the testimony indicates that he continued rendering services to the trustees until approximately January of 1952.

Bartels, the co-trustee in active charge and management of the debtor corporation, was at all times aware of Messenger's activities. It was at Bartels request that Messenger interested Mapes and Goodall in the debtor. Bartels knew that Mapes, Messenger on behalf of Goodall and Goodall himself were purchasing claims against the debtor corporation at less than face value. Bartels was even present with Messenger when he contacted some of the creditors. Bartels was not interested in acquiring claims himself at a discount for the benefit of the debtor because he considered this improper—"possibly a preference of creditors." He was of the opinion that Messenger on behalf of Goodall was acquiring the claims in the same manner that any third person with funds would acquire claims and, as has been pointed out, Bartels believed that it would be to the advantage of the debtor and the administration of the bankrupt's estate if the claims were acquired by one or more with whom he could deal. Consequently Bartels has not in the past, and does not now present any objection to the acquisition of these claims.

Co-trustee Crossman also knew, as early as February 1, 1951, that Goodall was acquiring claims of the general creditors at a discount. However, he was not cognizant of any participation by Messenger in the acquisition of these claims until after they had all been assigned to Goodall.

### Discussion

At this time the court is not primarily concerned with the Goodall partnership's right to vote on a plan of reorganization. Although counsel for the sole stockholder introduced considerable evidence on this issue at the hearing and developed the matter fully in his brief, the court is inclined to the view that a decision determining the claimant's right to vote on a plan of reorganization would, if presently rendered, be premature. The proof and allowance of a claim or interest as to ownership are first to be accomplished and after such allowance, if made, and classification of the claim or interest, the right to vote should, if challenged, be considered in connection with subsequent proceedings. When proof of a claim or interest is offered for allowance, its right to vote in the reorganization is not the question then before the court. The only issues at this stage of the proceedings are whether the creditor or stockholder is actually a creditor or stockholder, for how much, and how should his claim or interest be classified. See Texas Hotel Securities Corp. v. Waco Development Co., 5 Cir., 1936, 87 F.2d 395; 6 Collier on Bankruptcy (14th Ed.), Sec. 9.02, p. 2772.

The claims now held by the Goodall partnership were, prior to their assignment by the general creditors, valid claims against the debtor corporation. No one contends the contrary. Nor does anyone suggest that the assignment of claims either before or after allowance is forbidden by the Bankruptcy Act. Cf. Mokava Corp. v. Dolan, 2 Cir., 1945, 147 F.2d 340. The sole stockholder bases its objection to the Goodall claims upon a line of authorities holding:

"Where claims or interests have been assigned or purchased, allowance thereof may be controverted on the ground that as a result of fraud, misrepresentation or overreaching or violation of a fiduciary obligation, such

claims or interests were acquired for an inadequate consideration, and where this can be shown the court may disallow the claim or interest or (more often) allow it only for the amount actually paid."

6 Collier on Bankruptcy (14th Ed.), Sec. 9.04, pp. 2788, 2789, note 14. Before analyzing the cases in support of this doctrine the court would like to point out why the case now under consideration is not factually within the purview of the proposition relied upon.

■■ First. The evidence neither indicates, nor demonstrates, that there was any fraud, misrepresentation or overreaching of the sellers in the acquisition of the Goodall claims; and the evidence relating to violation of a fiduciary obligation, in most respects at least, presents an extremely weak case. It should be emphasized that the present case does not involve the purchase by a trustee of trust property and the subsequent sale thereof at a profit to himself; but rather the purchase of the beneficiaries' interests in a trust estate by a third person, who received advice (but not any confidential information) from an accountant employed by the trustee for the purpose of auditing the records of the trust estate, and who, with the knowledge of those concerned, used the accountant as his agent for the purchase of claims. Of course, Messenger, the accountant in this case, had a duty not to disclose to a third person information which he had acquired during his audits, where he should know that the effect of such disclosure would be detrimental to the interests of the beneficiaries. Cf. Restatement of Trusts, sec. 170, comment r. However, the record does not disclose a violation of this duty. There is no evidence that Messenger gave Goodall any information which was not already a matter of public record.

Second. The court cannot, without indulging in considerable speculation, conclude that the claims in question were purchased for an inadequate consideration. The actual value of the claims is dependent on too many factors indeterminable, not only when the claims were purchased, but

even at this stage of the proceedings. If a plan of reorganization is effected the amount recognized by the general claimants will depend upon the provisions of the plan. If liquidation is required the amount recognized by general claimants will depend upon the extent of prior claims (including the presently uncertain expenses of administration) and the amount recognized by a forced sale of the debtor's assets.

With these factors in mind, let us proceed to an examination of the authorities. In Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418, a case relied upon by the objectors, the Supreme Court held that persons who knowingly join with a receiver in purchasing real estate at a sale made by the trustee of a deed of trust mortgage securing a debt due the receivership, are jointly and severally liable to the receivership for all profits realized from the purchase. This case involved a fiduciary who agreed to contribute to the purchase price of the trust property and received a share of the profits upon the subsequent sale of the property. Such facts are not present in the case now under consideration.

The Calton Cresent apartment house litigation is, in many respects, interestingly material to the case at bar. After insolvency had occurred, but prior to the filing of any petition in bankruptcy and while the debtor was still a going concern, corporate bonds of the debtor, Calton Crescent, Inc., were purchased by a director for his wife and mother with their funds and by a friend with his own funds on a director's tip. In the course of the bankruptcy proceedings objections were filed to the allowance of these claims. The matter was referred to the referee and he found that there was no concealment or overreaching of the sellers and concluded that the claims should be allowed in full. The district court upheld the referee's decision. In re Calton Cresent, S.D.N.Y. 1948, 80 F.Supp. 822. The case was appealed to the United States Court of Appeals for the Second Circuit and a majority of the court voted to affirm. 173 F.2d 944, 950, 13 A.L.R.2d 1160. Judge Swan, writing for the majority, pointed out:

"After insolvency it may be said that the directors are fiduciaries for the group of creditors who will share in the insolvent's estate. But the creditors who have retained their claims will suffer nothing whether or not the director is allowed to make a profit from his purchases. If a wrong has been done to any of the group of cestuis, it is to those who sold their claims at a price less than the dividend they would have received had they retained them. If they were suing for the wrong done them, they would have to show something equivalent to a fraudulent non-disclosure. Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853. Plainly if the contest for the director's profits was between the wronged cestuis and the unwronged cestuis, the former should prevail. Where it is between the unwronged cestuis and a director, if the former are allowed to prevail it can only be as a disciplinary measure against the director for wronging someone who has not complained of the wrong. That this is the real basis for the rule was recognized by Judge Kirkpatrick in the case of In re Real Estate Mortgage Guaranty Co., D.C.E.C.Pa., 55 F.Supp. 749, 752, where he said: ' * * * The doctrine that a receiver may not retain a personal profit made out of his trust is a prophylactic rule. It implements the law's precept that a trustee must give undivided loyalty to his trust. The surcharge is the section. * * * In the present case a substantial majority of the ultimate and only beneficiaries of the trust knew of and consented to the receivers earning these commissions by placing the insurance through his own agency. I think that is a controlling factor and that it gives the court full discretion to deny the surcharge.'

"The same judge made a similar statement in re Philadelphia & Western Ry. Co., D.C., 64 F.Supp. 738, 741: 'This limitation is not imposed upon the theory that such profits belong to the corporation by reason of any property right that it may have in them but is an administrative sanction for the enforcement of the rules of fiduciary conduct set by the law.' If the doctrine be recognized as a disciplinary sanction within the discretion of the court to impose or withhold, then, as Judge Kirkpatrick also said in the Mortgage Guaranty Co. case, 'Each case depends on its own circumstances'. In the case at bar, where there was no overreaching of the sellers, we are not convinced that the circumstances are such as to require imposition of the sanction, even if the proof of debt had been filed by a director of the debtor."

The reasons for withholding the disciplinary sanction in the Calton Crescent case are not nearly as impelling as the reasons for withholding it in this case.

In relation to the fact that Goodall received some advice from Messenger, an employe of the trustees, the court calls attention to another comment of Judge Swan in the Calton Crescent case:

"It is true that one who 'knowingly confederates' with a fiduciary in a breach of trust is not allowed to make a profit from the transaction. Jackson v. Smith, 254 U.S. 586, 589, 41 S. Ct. 200, 65 L.Ed. 418. But 'knowingly confederating' means more, in our opinion, than investing one's own funds on a 'tip' received from an officer or director of a debtor. With respect to Fribourg we see nothing in the record to justify a finding that he did more than this."

■■■ The Calton Crescent litigation culminated in the Supreme Court of the United States in the case entitled Manufacturers Trust Co. v. Becker, 338 U.S. 304, 70 S.Ct. 127, 132, 94 L.Ed. 107. The decision of the court of appeals was affirmed. The Supreme Court recognized the principle that

"equity must apply not only the doctrines of unjust enrichment when fiduciaries have yielded to the temptation of self-interest but also a standard of

loyalty which will prevent a conflict of interests from arising";
but the court proceeded to point out that with reference to the claims purchased by the director for his wife and mother the probability of conflict had not reached the point at which equity declares ended the opportunity for profitable trading, and with reference to the claims purchased by the director's friend and office associate the record precluded consideration of his claim as that of a director. Thus it is clear that the high degree of fidelity imposed upon a fiduciary should not, merely because some tenuous relation exists between the fiduciary and a third party, be imposed upon the third party.

The cases of In Re Norcor Mfg. Co., 7 Cir., 1940, 109 F.2d 407, In Re The Van Sweringen Company, 6 Cir., 1941, 119 F.2d 231 and In Re Los Angeles Lumber Products Co., S.D.Cal.1942, 46 F.Supp. 95, relied upon by counsel for the objector, are all distinguishable from the case at bar. In these cases officers and attorneys of insolvent debtor corporations purchased, either personally or through corporations formed for the purpose of purchasing, claims against the debtor corporations at substantially less than actual value. The claims were limited to the amount paid for them by these fiduciaries because of the basic and well settled equitable rule that a trustee can make no profit out of his trust.

"The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in any wise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity." Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151.

In the case now under consideration there is no showing that any fiduciary has now, or ever had, any interest in the claims in question, or stands to profit by their allowance.

The vitiating circumstance, i. e. the conflict between personal interest and fiduciary duty, is not present. The court would not be justified in delimiting claims owned solely and only by the Goodall partnership, since neither it nor its members ever occupied a fiduciary position in this proceeding. Cf. In Re Franklin Bldg. Co., 7 Cir., 1949, 178 F.2d 805 and In Re Lorraine Castle Apartments Building Corporation, 7 Cir., 1945, 149 F.2d 55. Messenger's relationship with both the trustees and Goodall does not require a contrary holding. Messenger was not a trustee in any true sense of the word. He was an employe of the trustees—employed for the specific purpose of auditing the records of the debtor. He conducted his audits competently and faithfully without disclosing any confidential information which may have come to his attention while he was serving the trustees. His employment by the trust in this limited capacity did not preclude his continuing employment by other clients, including Goodall. No one was deceived when Messenger acted as agent for Goodall in purchasing claims. All concerned were informed that Messenger was acting on behalf of Goodall, and not the trustees. Under these circumstances the court would not feel justified in disallowing, or even delimiting to the consideration paid therefor, the Goodall claims.

If the Goodall claims were limited a fair distribution of the bankrupt's estate would not result. On the contrary, the sole stockholder, who now objects to the Goodall claims, and who has in a sense "brought into" this proceeding, would be enriched at Goodall's expense. Such is not equity as we know it.

For the reasons stated in this memorandum, the Goodall claims will be allowed in full and classified in the same manner as the claims of all other general creditors.

Counsel for the claimants shall prepare and submit for approval the appropriate order to be entered in accordance with this memorandum.