Estate of Robert A. Goodall, C. M. Goodall, Executrix, et al. [1] v. Commissioner. Estate of Goodall v. Commissioner
Docket Nos. 72361, 95387, 95388, 95458, 3142-63, 3143-63.
United States Tax Court
T.C. Memo 1965-154; 1965 Tax Ct. Memo LEXIS 177; 24 T.C.M. (CCH) 807; T.C.M. (RIA) 65154; 22 Oil & Gas Rep. 847; June 4, 1965
James W. R. Brown and William J. Brennan, Jr., Insurance Bldg., Omaha, Neb., for the petitioners. Claude R. Wilson, Jr., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined *180 deficiencies and additions to tax as follows: Docket
Estate Tax
Petitioner
No.
Deficiency
Estate of Robert A. Goodall, C. M. Goodall,
72361
$280,905.06
Executrix
Addition to Tax
Docket
Income Tax
Sec. 291(a)
Petitioner
No.
Year
Deficiency
I.R.C. of 1939
Estate of Robert A. Goodall,
Deceased, Clarice
M. Goodall, Executrix
95387
1953
$858,614.42
$249,988.74
Addition to Tax
Docket
Income Tax
Sec. 6651(a)
Petitioner
No.
Year
Deficiency
I.R.C. of 1954
Estate of Robert A. Goodall,
Deceased, Clarice
M. Goodall, Executrix
3142-63
1954
$150,586.42
$61,364.67
Docket
Income Tax
Petitioner
No.
Year
Deficiencies
Estate of Robert A.
Goodall, Deceased,
95388
1950
$225,080.78
Clarice M. Goodall,
1951
552,220.56
Executrix, and
1952
507,838.36
Clarice M. Goodall
1953
865,853.50
Additions to Tax - I.R.C. of 1939
Petitioner
§ 293(a)
§ 294(d)(1)(B)
§ 294(d)(2)
Estate of Robert A.
Goodall, Deceased,
$11,254.04
$16,188.19
Clarice M. Goodall,
27,611.03
$7,042.70
29,004.94
Executrix, and
25,391.92
28,463.24
Clarice M. Goodall
43,292.68
*181 Addition to Tax
Docket
Income Tax
Sec. 294(d)(1)(A),
Petitioner
No.
Year
Deficiencies
I.R.C. of 1939
C. M. Goodall
3143-63
1954
$217,034.15
$49,037.53
1955
330,254.33
1956
163,394.66
1957
90,889.55
1958
1,380.81
1959
14,322.26
Docket
Fiscal Year
Income Tax
Petitioner
No.
Ended May 31
Deficiencies
Good-All Electric Mfg. Co.
95458
1950
$126,935.74
1951
272,135.53
1952
375,793.77
1953
622,842.49
1954
646,528.93
In Docket No. 72361 (Estate of Robert A. Goodall), the respondent claimed an additional estate tax deficiency of $281,388.03, or a total estate tax deficiency of $562,293.09. The issues in these consolidated cases are (1) the fair market value on October 22, 1953 (the date of Robert A. Goodall's death) of the decedent's interest in the partnership of R. A. and C. M. Goodall, which depends upon the fair market value, as of that date, of certain oil reserves in the Little Beaver Field, Colorado; (2) the fair market value of the stock of Good-All Electric Mfg. Co. on October 22, 1953; (3) whether the liabilities of the Estate of Robert A. Goodall *182 should be increased due to income tax liabilities which may result from this Court's action in these cases; (4) whether the Estate of Robert A. Goodall is entitled to any deduction from the gross estate as a result of renegotiation; (5) whether the partnership income of R. A. and C. M. Goodall should be increased by treating certain withdrawals from Good-All Electric Mfg. Co. as dividends rather than loans; (6) whether a proper election was made by the partnership of R. A. and C. M. Goodall to expense intangible drilling and development costs; (7) whether petitioners in Docket No. 95388 are liable for additions to tax under sections 294(d)(1)(B) and/or 294(d)(2) of the Internal Revenue Code of 1939 for the years 1950, 1951 and 1952; (8) whether the partnership of R. A. and C. M. Goodall is entitled to a deduction of certain legal fees incurred in 1952 in connection with claims held by the partnership against Automatic Equipment Manufacturing Company; (9) whether respondent correctly disallowed a deduction for a portion of the purported rental payments made by Good-All Electric Mfg. Co. to the partnership of R. A. and C. M. Good-all in the fiscal years ended May 31, 1950 through 1954; *183 (10) whether Good-All Electric Mfg. Co. was availed of to avoid or prevent the imposition of income tax on its stockholders within the meaning of section 102 of the Internal Revenue Code of 1939 in the fiscal years ended May 31, 1950 through 1954; (11) whether Good-All Electric Mfg. Co. is entitled to a dividends-paid deduction under sections 27 and 102(d)(2) of the Internal Revenue Code of 1939 for any of the taxable years before us; (12) whether the Estate of Robert A. Goodall (Docket No. 3142-63) is liable for additions to tax in 1954 under section 6651(a) of the Internal Revenue Code of 1954; (13) whether Clarice M. Goodall (Docket No. 3143-63) is liable for additions to tax in 1954 under section 294(d)(1)(A) of the Internal Revenue Code of 1939; and (14) whether Clarice M. Goodall (Docket No. 3143-63) is entitled to an interest deduction in 1956 as a result of the payment of $109,683.70 in that year to the district director of internal revenue in Omaha, Nebraska. Findings of Fact Some of the facts were stipulated and they are so found. Robert A. Goodall and Clarice M. Goodall, husband and wife, were residents of Ogallala, Nebraska, until the date *184 of Robert's death, October 22, 1953. Clarice has remained a resident of Ogallala, Nebraska. Robert and Clarice filed joint income tax returns for the year 1949 through 1952 with the collector of internal revenue or the district director of internal revenue in Omaha, Nebraska. A joint return was filed by Robert A. Goodall (deceased) and Clarice M. Goodall with the district director in Omaha, Nebraska, for the year 1953. Clarice filed her income tax returns for the years 1954 through 1959 with the district director of internal revenue at Omaha, Nebraska. Fiduciary income tax returns were filed by the Estate of Robert A. Goodall, Clarice M. Goodall, Executrix, with the district director of internal revenue in Omaha, Nebraska, for the years 1953 and 1954. The estate tax return of Robert A. Goodall, Deceased, was filed by the executrix of the estate with the district director of internal revenue at Omaha, Nebraska. Partnership income tax returns for the partnership of R. A. and C. M. Goodall were filed for the years 1949 through 1954 with the collector of internal revenue or the district director of internal revenue at Omaha, Nebraska. Good-All Electric Mfg. Co., a Nebraska corporation, *185 filed its corporation income tax returns for the taxable years ending May 31, 1950 through 1954 with the collector of internal revenue or the district director of internal revenue in Omaha, Nebraska. Good-All Electric Mfg. Co. used an accrual method of accounting. On and immediately prior to May 28, 1949 the principal products being manufactured and sold by the partnership of R. A. and C. M. Goodall were (1) capacitors, (2) cathodic protection rectifiers, (3) soldering machines, (4) watch-cleaning machines and (5) fishing reels. Robert and Clarice were equal partners in the partnership. The manufacturing operations were carried on in two plants owned by the partnership in Ogallala, Nebraska. The capacitors manufactured by the partnership on and prior to May 28, 1949 were for proximity fuses for the United States Navy Department. The partnership had been approved by the Navy Department as an authorized supplier of capacitors for military purposes. On May 11, 1940 Robert and Clarice formed a corporation known as Ogallala Industries, Inc. The corporation did not conduct any business operations and its charter was allowed to lapse on December 30, 1944. Its corporate existence was revived *186 on November 21, 1947, and on April 8, 1949 the Articles of Incorporation of Ogallala Industries, Inc. were amended to change the corporate name to Good-All Electric Mfg. Co. and to make other changes. On May 28, 1949 the partnership of R. A. and C. M. Goodall and Good-All Electric Mfg. Co. executed a Manufacturing and Rental Agreement under which the corporation took over the operation of the partnership business. The agreement provided, in part, as follows: MANUFACTURING AND RENTAL AGREEMENT WHEREAS the "Good-All Electric Mfg. Co." of Ogallala, Nebraska hereinafter referred to as the party of the first part is desirous of engaging in the manufacture and sale of products formerly made by the partnership of R. A. and C. M. Goodall dba "Goodall Electric Mfg. Co." hereinafter referred to as the party of the second part of the partnership. * * *
THEREFORE it is now agreed that the party of the first part shall be granted the right to produce such materials and products as were formerly made by party of the second part subject to the provisions of the sections listed below: Section 1. The party of the first part shall pay to the partnership an amount equal to 5% of the gross *187 sales of the party of the first part. It is understood that this 5% hereinafter referred to as the commission is being paid for the use of the trade name, plant and equipment formerly used by the partnership in lieu of any royalties for the privilege of manufacturing such products and for the benefit of the industrial "know-how" of the engineers and employees of the partnership. Section 2. All expenses of upkeep and maintenance of the building and equipment including insurance, taxes and necessary repairs are to be paid by the party of the first part in addition to the 5% commission as set forth in Section 1. Section 3. Party of the first part agrees that it will employ no one other than R. A. Goodall and C. M. Goodall during such time as this agreement is in force. The partnership is to employ all other personnel used by party of the first part and will be reimbursed for all employees' salaries, payroll taxes and workmens compensation insurance paid in connection with the use of the employees of the party of the second part by the party of the first part. It is agreed that in order to simplify the bookkeeping, the party of the first part may, at its election, make all such payments *188 direct provided it is clearly understood between the parties signing this agreement that the party of the second part is at all times the employer of all personnel used by the first party except the two individuals named at the beginning of this section. The agreement was executed by Robert A. Goodall and Clarice M. Goodall as President and Secretary-Treasury, respectively, of Good-All Electric Mfg. Co., and by the same two parties in their capacities as partners of the R. A. and C. M. Goodall partnership. Good-All Electric Mfg. Co., throughout the years before us, engaged solely in the manufacture of capacitors, cathodic protection rectifiers, electric soldering machines, watch-cleaning machines and fishing reels. For approximately the first three years of the operation of Good-All Electric Mfg. Co. (hereinafter sometimes called Good-All) its transactions continued to be recorded on the partnership books, which were used as the basis for computing the corporation's income. No stock was issued by Good-All until some time during its fiscal year ended May 31, 1953, when 300,000 shares of stock were issued to Robert and Clarice (150,000 shares to each) in their capacities as partners *189 in the R. A. and C. M. Goodall partnership. During each of the fiscal years ended May 31, 1950 through 1954 Good-All's capacitor sales amounted to more than 90 percent of its total sales. Good-All's gross sales of capacitors during these fiscal years were as follows: Fiscal Year
ending
Gross Sales of
May 31
Capacitors
1950
$1,080,734.54
1951
2,474,708.18
1952
5,761,401.22
1953
5,280,247.13
1954
8,841,906.74
The capacitors were for use in a proximity fuse under a Navy ordnance contract. Good-All itself did not have any contract with the Navy but supplied capacitors to firms which did have such contracts. During the years here involved Good-All had five customers for its capacitors, with Eastman Kodak as the principal customer. Good-All's principal competitors during these years were Sprague Electric Company, Aerovox Corporation and Cornell-Dubilier Corporation. During the years here involved Good-All was constantly engaged in reducing the size and cost of the capacitors and in meeting the production problems created by such efforts. Good-All also worked on problems involving a satisfactory enclosure for the capacitors. During the summer of 1953 *190 Robert made a trip to England to investigate the possibilities of establishing a plant there in connection with the Good-All Electric Mfg. Co. These plans were abandoned as a result of Robert's death in October 1953. Robert also made several trips to Mexico in 1953 to investigate the possibility of establishing a plant there in connection with the Good-All Electric Mfg. Co. A corporation was formed in Mexico and two bank accounts were opened in Mexico in May 1953 with total deposits of $2,315.14. At the same time a bank account in the amount of $34,236 was opened in an El Paso, Texas, bank. The plans to open a Mexican plant were subsequently abandoned. In March 1952 the Renegotiation Board notified Good-All that, pursuant to the Renegotiation Act of 1951, its fiscal year ending May 31, 1950 was being considered by the Board. On July 29, 1952 the Board notified Good-All that the Board was commencing renegotiation proceedings with respect to Good-All's operations for the fiscal year 1950. By January 1954 Good-All's fiscal year ending May 31, 1951 was before the Board. In November 1954 the Board notifed Good-All of a tentative determination for the fiscal year 1951, and in April 1955 *191 an agreement was reached by Good-All and the Board for the fiscal period ended May 31, 1951. In February 1956 the Renegotiation Board notified Good-All of the final determination involving Good-All's fiscal year ended May 31, 1952, and in August 1959 the Renegotiation Board notified Good-All of the final determinations for Good-All's fiscal years ended May 31, 1953 and 1954. As a result of the renegotiations the net income of Good-All was reduced, credits were allowed under section 3806(b) of the Internal Revenue Code of 1939 (for taxes paid on higher income), and Good-All was required to repay the amounts as follows: Fiscal Year
Credit under
Ended
Reduction in
sec. 3806(b) of
May 31
Net Income
the 1939 I.R.C.
Net Repayment
1951
$ 275,000
$218,367.64
$ 56,632.36
1952
1,200,000
840,000.00
360,000.00
1953
550,000
399,987.34
150,012.66
1954
1,100,000
688,087.67
411,912.33
Good-All reported the following amounts of taxable income on its corporation income tax return filed for its fiscal years ended May 31, 1950 through 1954, respectively: $323,366.13, $754,934.46, $2,118,545.45, $1,458,268.97 and $3,405,106.25. The balance sheets included *192 in the returns filed by Good-All for its fiscal years ended May 31, 1950 through 1954 show the following amounts of (1) cash and (2) earned surplus and undivided profits: Fiscal Year
Ended
Earned Surplus and
May 31
Cash
Undivided Profits
1950
$ 515,940.38
$ 323,366.13
1951
685,997.36
955,421.46
1952
2,269,514.88
1,138,748.37
1953
1,619,636.41
1,581,729.06
1954
3,198,585.98
2,528,642.29
No dividends were declared by Good-All during its fiscal years ending May 31, 1950 through 1954. In their joint returns for 1950 through 1954, Robert and/or Clarice reported adjusted gross income in the respective amounts of $148,275.95, $59,382.42, $49,091.08, $391,289.94 and $541,987.63. During the fiscal years of Good-All ending May 31, 1950 through 1954, Robert and Clarice continually withdrew corporate funds for their own or partnership purposes. Most of the money so withdrawn from the corporation by the Goodalls was used for the Goodall Oil Co., which was owned by the partnership. As of June 1, 1954 the outstanding balance of withdrawals from the corporation for use by the Goodall Oil Co. was $1,318,088.74. The outstanding balances of withdrawals from *193 the corporation through the fiscal year ended May 31, 1953, shown in the corporation's income tax returns as amounts due from its officers, were as follows: Fiscal Year
Ended
May 31
Balance
1950
$203,043.48
1951
273,152.58
1952
309,696.15
1953
880,273.20 As of May 31, 1954 the outstanding balance of withdrawals from Good-All was approximately $1,660,000. On June 2, 1954 Clarice executed a check payable to Good-All in the amount of $1,662,977.74. Respondent determined in Docket No. 95388 (Estate of Robert A. Goodall and Clarice M. Goodall, individually, for the years 1950 through 1953) and in Docket No. 95387 (Estate of Robert A. Goodall, for the year 1953) that the amounts withdrawn from the corporation were taxable as dividends in the following amounts: Year
Amount
1950
$ 240,648.55
1951
405,300.99
1952
390,340.91
1953
1,222,652.22 As a result of stipulated concessions by the respondent, the withdrawals were reduced to the following amounts: Year
Amount
1950
$ 215,075.83
1951
388,193.95
1952
242,230.68
1953
1,075,155.68 In Volume 3 of the stipulations the petitioners in Docket Nos. 95387 and 95388 concede *194 "that the partnership had unrecorded withdrawals in the following amounts which are dividends to the extent that the corporation had earnings and profits: 1950
None
1951
$ 5,075.10
1952
17,699.27
1953
1,432.37"
By letter dated May 8, 1961 the respondent notified Good-All pursuant to section 534 of the Internal Revenue Code of 1954 that he proposed to issue a statutory notice of deficiency for the fiscal years ended May 31, 1950 through 1954 with respect to the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954. Good-All Electric Mfg Co. (Docket No. 95458) filed a statement with respondent under section 534(c) of the Internal Revenue Code of 1954 of the grounds on which the corporation relied to establish that all or any part of its earnings for the fiscal years ending May 31, 1950 through 1954 were not permitted to accumulate beyond the reasonable needs of its business. Respondent determined that Good-All Electric Mfg. Co. "was availed of for the purpose of preventing the imposition of the surtax upon its shareholders under section 102 of the Internal *195 Revenue Code of 1939 through the medium of permitting its earnings or profits for the taxable years ended May 31, 1950, May 31, 1951, May 31, 1952, May 31, 1953, and May 31, 1954, to accumulate beyond the reasonable needs of its business instead of being divided or distributed to your shareholders." Respondent disallowed a portion of the payments made by Good-All to the partnership of R. A. and C. M. Goodall under the Manufacturing and Rental Agreement in each of the fiscal years ended May 31, 1950 through 1954. Respondent explained these adjustments as follows: [Fiscal Year ended May 31, 1950] (a) The deduction of $59,827.41 claimed on your return as rent is disallowed to the extent of $31,774.03 because it has not been established that the amount in excess of $28,053.38 constitutes an ordinary and necessary business expense. * * *
[Fiscal Year ended May 31, 1951] (a) The deduction of $134,314.01 claimed on your return as rent is disallowed to the extent of $98,812.13 because it has not been established that the amount in excess of $35,501.88 constitutes an ordinary and necessary business expense. * * *
[Fiscal Year ended May 31, 1952] (a) The deduction *196 of $308,607.30 claimed on your return as rent is disallowed to the extent of $263,644.37 because it has not been established that the amount in excess of $44,962.93 constitutes an ordinary and necessary business expense. * * *
[Fiscal Year ended May 31, 1953] (a) The deduction of $283,153.65 claimed on your return as rent is disallowed to the extent of $218,340.64 because it has not been established that the amount in excess of $64,813.01 constitutes an ordinary and necessary business expense. * * *
[Fiscal Year ended May 31, 1954] (a) The deduction of $481,280.05 claimed on your return as rent is disallowed to the extent of $382,226.43 because it has not been established that the amount in excess of $99,053.62 constitutes an ordinary and necessary business expense. * * * The estate tax return filed for the Estate of Robert A. Goodall listed the decedent's 50 percent interest in the R. A. and C. M. Goodall partnership at a value of $2,620,000 as of October 22, 1953. A summary of the partnership assets as of October 22, 1953, which was attached to the estate tax return, shows the Good-All Electric Mfg. Co. stock at a value of $3,090,000. Total partnership assets *197 as of that date are shown at a value of $5,970,238.09, liabilities of $488,178.34 and a net worth of $5,482,059.75. On or about May 31, 1954 the partnership in liquidation distributed some of its assets to the partners, and on January 3, 1955 the partnership was completely liquidated. On or about May 31, 1954 the Estate of Robert A. Goodall received 275,000 shares of Good-All stock in partial liquidation of the estate's interest in the partnership and Clarice received 25,000 shares of Good-All stock in partial liquidation of her interest in the partnership. As indicated by the partnership liquidation agreement dated January 3, 1955, the 275,000 shares and the 25,000 shares of Good-All stock which had been previously distributed to the partners were valued for liquidation purposes in the respective amounts of $2,832,500 and $257,500, or a total valuation of $3,090,000. Some time prior to June 1954 five employees of Good-All made an offer to purchase the Good-All stock for approximately $3,000,000. This offer was subsequently accepted. On or about June 2, 1954, 275,000 shares of Good-All stock were sold by the estate to the five individuals, while the 25,000 shares of stock held *198 by Clarice were redeemed by the corporation. The five purchasers borrowed about $55,000 from a bank to finance a portion of the purchase price. The balance of the purchase price for the 275,000 shares of stock, approximately $2,800,000, was borrowed from the corporation, with notes given back to the corporation which were secured by the 275,000 shares of stock. Under a new lease agreement entered into on June 4, 1954 by the partnership of R. A. and C. M. Goodall and Good-All, the real estate, machinery and equipment which were owned by the partnership and were being used by the corporation were rented to the corporation for "an amount equal to 3% of the gross sales of all products manufactured on or in said real estate or manufactured by said machinery and equipment." At the same time the partnership granted to Good-All an option to purchase the real estate and machinery at a price which would be their fair market value as of June 1, 1954. In September 1949 C. A. Black conveyed a one-fourth interest in oil property, hereinafter called the Winters Lease, to the partnership of R. A. and C. M. Goodall. It was a common practice among oil drillers, after obtaining a lease, to locate *199 parties who would share the drilling costs and to convey an interest in the lease to these parties. On September 9, 1949 Robert A. Goodall and Black executed an operating agreement in connection with the Winters Lease which provided, in part, that "all expenses incurred in future drilling operations and all production and operating expense including the purchase of materials and supplies for said leasehold shall be paid for by the parties hereto and their successors in interest rateably in proportion to their ownership therein." A letter dated September 12, 1949 from Black to Robert A. Goodall stated, in part, as follows: Enclosed herewith please find your assignment for 1/4 interest in the Winters Lease for well to be drilled to the top of the Arbuckle pay zone with cable tools at a cost to you of $3,500.00 provided the well is a dry hole. If the well is a producer you pay your 1/4 for necessary casing and equipment to produce same. Robert A. Goodall paid the amount of $3,500 which he recognized in a letter to Black dated September 16, 1949 as covering the partnership's share of the cost of drilling. The drilling of the well on the Winters Lease, which had been started on August 30, 1949, was *200 completed on September 23, 1949. The well on the Winters Lease produced oil until it was abandoned in April 1950. Robert A. Goodall also paid the partnership's share of other expenses to Black in connection with the well drilled on the Winters Lease. The payment of $3,500 made by the partnership to Black was not included in the partnership's return for 1949 either as an expense or as a capital item. No intangible drilling or development cost was ever capitalized on the partnership's records or in its tax returns. On October 22, 1953, the partnership of R. A. and C. M. Goodall held certain interests in leases located in Colorado oil producing properties, hereinafter called the Little Beaver Field. In August 1953 a hearing was held before the Colorado Public Utilities Commission in connection with Robert A. Goodall's application to construct an oil pipeline with the Little Beaver Field and estimates were made on Goodall's behalf of the recoveable oil reserves in the field. In 1955 a pipeline was built by ColoradoInterstate Gas Company into the field, and a gasoline plant was eventually constructed there. By the end of October 1953 all of the Goodall wells in the Little Beaver *201 Field had been drilled, including eight on the Hubbird Lease, eight on the Kejr Lease, five on the Wheatlake Lease and three on the Downing Lease, or a total of 24 wells. At the date of Robert's death on October 22, 1953, the partnership was receiving about 22 percent of the total production from the Little Beaver Field. A summary of the partnership assets attached to the estate tax return shows the partnership's "Equity in Oil Business", as of October 22, 1953, at a value of $1,049,258.43. A detailed list of the various oil properties owned by the partnership, which is also attached to the estate tax return, shows the value of the partnership's interest in the oil leases in the Little Beaver Field in the amount of $1,353,830. This same list also includes other interests held by the partnership in oil and gas leases in addition to those in the Little Beaver Field. Respondent, in his statutory notice of deficiency in Docket No. 72361, determined that the "gross estate of the decedent should be increased by the amount of $1,018,850.69 for the reason that the fair market value of the decedent's interest in the partnership of R. A. Goodall and C. M. Goodall at the date of death was *202 $3,638,850.69 instead of $2,620,000.00 as reported." The increase in the valuation of the partnership interest resulted from adjustments made by respondent in the valuation of several partnership assets as of October 22, 1953. Among the partnership assets whose value was increased by respondent are (1) equity in oil business, from $1,049,258.43 (as shown in the appraiser's report attached to the estate tax return) to $1,321,089.75, and (2) intangibles-goodwill, increased from zero to $940,000. In an amendment to his answer in Docket No. 72361 the respondent claimed an additional deficiency of $281,388.03 (or a total estate tax deficiency of $562,293.09) based upon the following allegations of fact: a. The value of the decedent's interest in the partnership of R. A. Goodall and C. M. Goodall is increased by the sum of $1,205,630.00. b. This increase is attributable to the increase in the oil reserves of the Goodall Oil Company which is a division of the partnership of R. A. Goodall and C. M. Goodall. On October 26, 1956 and December 29, 1956 Clarice M. Goodall paid the respective sums of $500,000 and $109,683.70 to the district director of internal revenue in Omaha, Nebraska. *203 These amounts were placed in a suspense account pending the final determination of the tax liabilities of Robert A. and Clarice M. Goodall for the years 1950 through 1953. Clarice claimed an interest deduction of $109,683.70 in her income tax return filed for 1956 for the payment made by her to the district director of internal revenue in December 1956. Respondent disallowed this deduction in Docket No. 3143-63 with the explanation that it was "merely an advance payment with respect to deficiencies in income tax for prior years." During 1950 and 1951 the partnership of R. A. and C. M. Goodall purchased certain claims against the Automatic Equipment Manufacturing Company, hereinafter sometimes called Automatic. Proceedings for the reorganization of Automatic under Chapter X of the Bankruptcy Act were then pending in the United States District Court for the District of Nebraska. The sole stockholder of Automatic filed an application for allowance and classification of claims of creditors in which there was requested a separate classification of the claims of the partnership of R.A. and C.M. Goodall, and a further request that these claims either be denied or allowed only in the amount *204 which was paid by the partnership for the claims. Extended proceedings were held in the bankruptcy court with respect to the allowance and classification of these claims, including a full trial. The opinion and decision of the United States District Court (106 F. Supp. 699) concluded that "the Goodall claims will be allowed in full and classified in the same manner as the claims of all other general creditors." The sole stockholder of Automatic appealed from the decision to the Court of Appeals for the Eighth Circuit. While the appeal was pending, the stockholder of Automatic offered, for the first time, to purchase the claims from the partnership. A price was agreed upon and the sale was made. The appeal was then dismissed (202 F. 2d 955). The partnership of R.A. and C.M. Goodall paid $4,118.63 to legal counsel for services and expenses in connection with the said proceedings for the filing and allowance of the claims against Automatic. Respondent, in Docket No. 95388, disallowed a deduction for this expense with the following explanation: The amount of $4,118.63 expended for legal fees in connection with litigation involving claims against the [Automatic] *205 Equipment Mfg. Co. is disallowed as an ordinary and necessary business expense because said amount was expended for the acquisition of a capital asset. The net income of the partnership of R.A. and C.M. Goodall for the years 1951 and 1953 was renegotiated under the Renegotiation Act of 1951. The net amounts repaid as a result of renegotiation were as follows: Reduction in
Credit under Sec.
Net
Year
Net Income
3806(b)-1939 I.R.C.
Repayment
1951
$ 25,000
$ 13,571.88
$11,428.12
1953
240,000
198,716.81
41,283.19
Opinion These cases involve related taxpayers and the respondent has found it necessary to make inconsistent determinations as between different taxpayers in the different docket numbers. It is clear that such determinations are made in the alternative, and it is equally clear that once a holding is reached on an issue it will be applied consistently where more than one taxpayer is involved. There is no merit in petitioners' contentions that, where respondent chose to make alternative determinations, respondent failed in his statutory duty to make a proper determination or that he somehow failed to raise issues properly, thereby causing *206 the burden of proof to shift to him. Nor do we accept petitioners' argument that respondent, by making alternative determinations, is acting capriciously and in an arbitrary manner. Similar contentions were rejected by this Court in Nat Harrison Associates, Inc., 42 T.C. 601, 617, where we stated the following: Petitioner does contend, however, that respondent's various determinations with respect to the various taxpayers, which admittedly would subject to tax considerably more income than the total net profits from the three jobs, are thereby shown to be conflicting, arbitrary, and unreasonable and hence are not entitled to any presumption of correctness relying primarily on Helvering v. Taylor, 293 U.S. 507 (1935). In his opening statement counsel for respondent made it clear that the determinations were in the alternative and that respondent did not contend that the net profit from the contracts should be taxed more than once. Occasions often arise where, in order to protect the revenue, respondent must make alternative determinations which have the effect *207 of taxing income more than once. We do not think respondent's alternative determinations under the circumstances here present were arbitrary, capricious, or unreasonable. See Malat v. Commissioner, 302 F. 2d 700 (C.A. 9, 1962), affirming 34 T.C. 365 (1960), certiorari denied 371 U.S. 934 (1962), and Revell, Inc. v. Riddell, 273 F. 2d 649 (C.A. 9, 1959). Consequently, the presumption that respondent's determinations are correct would not be lost for that reason alone. * * * We are satisfied, from an examination of the notices of deficiency in all the docket numbers, that the determinations were properly made and that the presumption of correctness attaches to such determinations. Welch v. Helvering, 290 U.S. 111. The first issue is the fair market value of Robert's interest in the partnership of R.A. and C.M. Goodall on October 22, 1953, the date of his death. The value of the decedent's interest in the partnership as of that date was shown in the estate tax return in the amount of $2,620,000. [2] Respondent determined that the fair market value of the decedent's partnership interest was $3,638,850.69 as *208 a result of various increases determined by respondent in the value of several partnership assets, including the oil interests owned by the partnership. Among its other oil interests the partnership owned partial interests in four leases located in the Little Beaver Field in Colorado. It appears from a schedule attached to the estate tax return that the estate valued the partnership's interest in these four oil leases at $1,353,830 as of October 22, 1953. Respondent contends on brief that the correct fair market value of the partnership's interest in the oil reserves in the Little Beaver Field was $3,772,840 as of that date. Respondent, in an amendment to his answer in Docket No. 72361, alleged that the "value of the decedent's interest in the partnership of R.A. Goodall and C.M. Goodall is increased by the sum of $1,205,630.00 * * * attributable to the increase in the oil reserves of the Goodall Oil Company which is a division of the partnership of R.A. Goodall and C.M. Goodall." Respondent has the burden of proof on this new matter pleaded in his amended answer. Rule 32, Tax Court Rules of Practice.
*209 Two of respondent's witnesses (Sims and Jackson) had previously testified as witnesses on Goodall's behalf during a hearing held before the Public Utilities Commission of Colorado in August 1953 in connection with Goodall's application to construct a pipeline into the Little Beaver Field area. Respondent relied largely upon these two witnesses to establish the total estimated oil reserves in the entire Little Beaver Field at that time. Both witnesses based their estimates, not only on the drilled acreage in the field, but also on the potential in the undrilled acreage as indicated by available geological information. In this manner the two witnesses estimated that the maximum oil reserves in the Little Beaver Field (as indicated by respondent's Exhibit PPP) ranged from 13,635,000 to 14,220,000 barrels. A third witness developed testimony to show that the Goodall partnership, through its partial interests in the four oil leases, would be entitled to 17.37115 percent of the production from the entire Little Beaver Field. A fourth witness (revenue agent Cameron) testified that the sales of fractional interests in oil properties in this same general area in the summer of 1953 indicated *210 a value per barrel of oil in the amount of $1.8793. Cameron then computed the value of the Goodall partnership's interest in the oil reserves by using 13,927,500 barrels (the average of the maximum oil reserves estimated by Sims and Jackson) as the total field reserves, and then taking 17.37115 of this amount to get the reserves which would be allocable to the partnership, or 2,419,367 barrels. The prior production from the Goodall leases (416,320 barrels) was subtracted to get the net oil reserves attributable to these leases as of October 22, 1953, or 2,003,047 barrels. On the basis of $1.8793 per barrel, the total value of the partnership's remaining oil reserves in the Little Beaver Field would be $3,764,326. In connection with a separate valuation analysis made by Cameron, he testified that "I would value in my opinion the oil in the ground at Little Beaver at the date of death at $1.25 per barrel." With this valuation, and again using an estimated net oil reserve of 2,003,047 barrels, Cameron computed the value of such reserve attributable to the Goodall partnership interests in the amount of $2,503,809. Petitioner in Docket No. 72361 relies upon the testimony and evidence *211 of a witness (Low) who, using a different approach, estimated the oil reserves of each of the Goodall leases separately as of October 22, 1953 and then proceeded to compute the partnership's estimated future net operating profit (based upon the estimated future oil reserves) from all four leases in the total amount of $2,707,840. Finally, to obtain a fair market value for Goodall's interest in these leases as of the relevant date, the witness assumed that "a buyer is entitled to approximately a dollar profit per dollar invested" and, on that basis, estimated a fair market value of $1,353,830 for Goodall's share of the oil leases in the Little Beaver Field, which was approximately one-half of the estimated future net profit from these leases. The witness indicated that his appraisal showing the above figures had been prepared for estate tax purposes in connection with the estate of Robert A. Goodall. Both parties have also introduced in evidence the actual production figures through the first few months of 1964 of the entire Little Beaver Field as well as from the four leases in which the Goodall partnership had an interest, and it is shown that by March 1, 1964 the total field production *212 had reached 11,884,018 barrels. [3]
We have examined in detail the various computations made by the parties and have paid special attention to the underlying estimates and assumptions which were necessarily used in making a valuation of this kind. Witnesses relied on geological data to determine the underlying sand thickness in this region, and to determine the estimated recovery in barrels per acre foot. Consideration was also given to the declining yield of the field in its later stages of development. We are satisfied that the basic approaches adopted by the parties in placing a value on the relevant oil reserves are valid. However, upon careful review of all the evidence we are convinced that the respondent's proposed valuation of approximately $3,770,000 is excessive since we believe some of the underlying estimates are too high. While the actual production figures in evidence give substantial support to respondent's estimates of total future oil reserves for Little Beaver Field, such estimates represent maximum figures of probable oil production from the *213 entire field, and we are persuaded that such estimates are too high. Moreover, we think that the price per barrel of $1.8793 which respondent uses in one of his exhibits to reach a valuation figure of $3,764,326 for the Goodall partnership oil reserves is not without its infirmities. We do not believe it would be necessary to make a further detailed analysis of the evidence. Taking into consideration all of the evidence and making all the adjustments we deem appropriate, we find that the fair market value as of October 22, 1953 of the interests held by the partnership of R.A. and C.M. Goodall in the Little Beaver Field was $2,400,000. We must next determine the fair market value as of October 22, 1953 of another partnership asset, the Good-All Electric Mfg. Co. stock. The estate tax return which showed decedent's interest in the R.A. and C.M. Goodall partnership as $2,620,000, showed the Good-All Electric Mfg. Co. stock among the partnership's assets at a valuation of $3,090,000. This stock valuation was accepted by the respondent. However, the petitioner alleged in its petition that the value of this stock was "substantially less" than $3,090,000. In its brief, the petitioner contends *214 that a reasonable valuation for the stock would be $2,233,000. We think the evidence in this record overwhelmingly indicates that the fair market value of the stock was $3,090,00, and we are satisfied that the petitioner has not met its burden of establishing some lesser amount. In addition to showing the $3,090,000 value for the stock in the estate tax return, this same figure was used in the partnership liquidation agreement (dated January 3, 1955) to value the 300,000 shares of Good-All stock as of May 31, 1954 for liquidation purposes. [4] Further support of this stock valuation is provided by the sale of the Good-All stock which took place in June 1954, some seven months after decedent's death. The purchasers were five former employees of the corporation. One of the purchasers testified that the purchase offer made to Clarice M. Goodall was "[basically,] $3 million for the stock of the company." Actually, they paid about $2,800,000 for 275,000 shares of the stock which were owned by the estate, while the remaining 25,000 shares which were held by Clarice were redeemed by the corporation. [5]
*215 Fair market value has been defined as the price at which a willing buyer and a willing seller would arrive, after negotiation for sale where neither is acting under compulsion. In re Williams' Estate, 256 F. 2d 217, affirming a Memorandum Opinion of this Court. It is difficult to understand how petitioner can argue for some lesser valuation here when an actual sale of the stock took place so near the date of decedent's death. Respondent has introduced further evidence to support his valuation of the Good-All stock. Respondent's witness (revenue agent Calhoun) made several independent appraisals of the fair market value of the Good-All stock based upon extensive comparisons with two different groups of corporations. One group of corporations was engaged in manufacturing products comparable to the Good-All products, while the other group of corporations was selected primarily because they were financially comparable to Good-All. In each analysis the fair market value of the Good-All stock was developed from a comparison of Good-All's operations with the net earnings, net worth *216 and dividends records of the corporations. In the first analysis (involving a comparison with the eight corporations that were financially comparable to Good-All) the fair market value of the 300,000 shares of Good-All stock as of October 22, 1953 was determined to be $3,225,000, while in the second analysis (involving a comparison with 10 corporations whose product was similar to Good-All's) the fair market value of the Good-All stock was placed at $3,675,000. We have examined the evidence of petitioner's witness who used for comparison purposes the earnings record and the stock value of Cornell-Dubilier, Sprague Electric Co. and McQuay-Norris. We notice that the average earnings per share of McQuay-Norris, as well as the market value of its stock as of October 22, 1953, are both markedly lower than the comparable figures for Cornell-Dubilier and Sprague Electric Co. While the primary business of Cornell-Dubilier was the manufacture of capacitors, which product was also manufactured by Sprague Electric Co., it appears that McQuay-Norris did not manufacture capacitors, but instead, manufactured automobile pump equipment and also had an electric products division. The witness mentioned *217 controllers, contractors, lift trucks, pressure switches, electric ignition systems and gas clothes dryers. Using these comparative figures and making other assumptions, the witness computed an amount of $2,628,026 for the Good-All stock (9.27 times its average earnings from 1950 through 1953). The witness then took into account an underwriting discount of about 10 percent (on the assumption that a public offering would be made of the stock), certain other registration expenses and other factors which made a total discount of 15 percent. The witness then applied this discount to the $2,628,026 figure to obtain a fair market value of $2,233,823 for the Good-All stock as of October 22, 1953. We have considered all of the evidence, and, on the basis of the entire record, we find that the fair market value of the Good-All stock was $3,090,000 as of October 22, 1953. Among the remaining adjustments made in the notice of deficiency (Docket No. 72361) by respondent to the partnership assets was the item of "Intangibles - goodwill". This item did not appear among the partnership assets in the appraiser's report which was attached to the estate tax return. Respondent determined that good *218 will should be included in the partnership assets in the amount of $940,000. Although petitioner alleged error in its petition as to this item, [6] it has introduced no evidence to show that this adjustment was incorrect. About all we can glean from petitioner's brief is the summary statement that all good will and other intangibles were transferred to the five employees who purchased Good-All Electric Mfg. Co. in June 1954. But as indicated earlier in the opinion, respondent left undisturbed the petitioner's estate tax valuation of the Good-All Electric Mfg. Co. stock which was listed among the partnership assets at a valuation as of October 22, 1953 of $3,090,000. Here we are concerned with an adjustment made by the respondent to a separate partnership asset. There is no convincing evidence in the record to show that this disputed good will item was somehow involved with the valuation of the Good-All Electric Mfg. Co. stock, which we have discussed earlier in the opinion. Petitioner has the burden of proving that the respondent's *219 determination as to the good will item was in error, and it is clear that petitioner has not met this burden. We sustain respondent on this issue. Petitioner also argues that, in reaching a valuation of the decedent's interest in the partnership as of October 22, 1953, the respondent failed to give any consideration to renegotiation liabilities of the partnership in 1953 and, in addition, instead of valuing the decedent's interest as one-half of the underlying asset value of the partnership, should have taken into consideration a discount of from 15 to 20 percent. There is no merit in either of these contentions. As to the 1953 renegotiation liability, about all we can tell from the record with any assurance is (as stipulated) that (1) the year 1953 was renegotiated and (2) as a result of such renegotiation the net repayment (after credit under section 3806(b) of the 1939 Internal Revenue Code) which had to be made to the Government was $41,283.19. We are concerned with the valuation of the partnership interest as of October 22, 1953. What evidence there is indicates that it was not until several years after 1953 that the renegotiation liability was known to exist and there is *220 no evidence to indicate that even a contingent liability for renegotiation existed at the end of 1953. Nor is there any evidence to support the 15 or 20 percent discount of decedent's partnership interest. Except for some broad generalities on brief, petitioner introduced no evidence to show that a one-half interest in this particular partnership, because of its peculiar nature or its magnitude or the diversity of its assets, should be so discounted. Petitioner has not met its burden on either of these contentions. The next issue is whether the Estate of Robert A. Goodall is entitled to a deduction under section 812(b) of the 1939 Internal Revenue Code for any additional income tax liabilities which may arise as a result of our decisions in the cases now pending before the Court. Section 812(b)(3) of the 1939 Internal Revenue Code allows a deduction from the gross estate "for claims against the estate * * * as are allowed by the laws of the jurisdiction * * * under which the estate is being administered, but not including any income taxes upon income received after the death of the decedent." Robert and Clarice filed joint income tax returns for the years 1950 through 1952 and *221 a joint return was also filed for 1953, the year of decedent's death. All of these years are before this Court involving various amounts of proposed income tax deficiencies. Respondent's argument for the disallowance of any of these contested liabilities as deductible claims against the estate is this: Where joint returns are filed, the liability for the tax is joint and several; the portion of the joint liability allowable as a claim against the estate is the amount for which the decedent's estate would be liable under local law, as between the decedent and his spouse, after enforcement of any effective right of reimbursement or contribution; here, there has been no showing made as to the extent of the estate's liability under local law. We see no serious obstacles in making a proper allocation of any additional income tax liabilities determined by this Court for the years 1950 through October 22, 1953 so that the estate's portion of such liabilities can be utilized as a deduction under section 812(b)(3) of the 1939 Internal Revenue Code. Respondent, in the notice of deficiency in Docket No. 72361, also increased decedent's interest in the partnership by $123,208.35 to reflect *222 an adjustment made by respondent to decedent's partnership capital account. The adjustment was correctly made to reflect the difference in the total amounts of income drawn by Robert and Clarice, respectively, from the Good-All Electric Mfg. Co. over the years here relevant and treated by them as partnership income. We sustain respondent as to this adjustment. Petitioner also raised other issues in its petition but has failed to pursue them or to introduce any evidence to show that respondent's determinations were incorrect. With the record as it stands, we find that petitioner has failed to meet its burden as to such issues. Respondent has made certain concessions which can be given effect in the Rule 50 computation. The next issue which involves the Good-All Electric Mfg. Co. in Docket No. 95458 is whether the corporation was availed of during its fiscal years ended May 31, 1950 through 1954 for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings and profits to accumulate instead of being divided or distributed. Section 102 of the 1939 Internal Revenue Code. Respondent contends that the earnings and profits of the *223 corporation were permitted to accumulate beyond the reasonable needs of the business during each of these years. Respondent mailed a notification under section 534(b) of the 1954 Internal Revenue Code to the corporation, which, in accordance with section 534(c) of the 1954 Internal Revenue Code, submitted a statement to the respondent giving the grounds upon which it relied to establish that all or any part of its earnings and profits had not been permitted to accumulate beyond the reasonable need of its business. Section 534(a) of the 1954 Internal Revenue Code provides that the burden of proof on the allegation that all or any part of the earnings and profits of the petitioner had been permitted to accumulate beyond the reasonable needs of the business is on the respondent with respect to the grounds set forth in the petitioner's statement. The corporation's statement listed the following grounds for each of the years here involved: (1) the earnings and profits were accumulated to provide for the very large and undetermined liabilities to the Government for renegotiation of war contracts, for income and excess *224 profits taxes and for the operational needs of the business; (2) the earnings were needed for the contemplated expansion of the business into other fields, the acquisition of other companies and businesses and for the planned construction of factories in other countries; and (3) the earnings and profits were needed to provide against losses and costs of changing to different fields of manufacturing, to offset losses incident to termination of military contracts, to supply the funds to obtain the necessary plant and equipment for the manufacture of civilian items and to finance the development of a market for such items. Respondent argues that the corporation's statement does not contain the required facts to support the listed grounds and that, consequently, such statement does not shift the burden of proof to respondent as to any of the grounds. It is not at all certain that the facts set forth by the corporation are sufficient to support the listed grounds. However, even if we assume that the burden of proof has shifted to the respondent, we feel that he has successfully met this burden. No dividends were declared by Good-All Electric Mfg. Co. during its fiscal years ended May 31, 1950 through *225 1954. [7]The corporation's records show that its earned surplus and undivided profits at the end of the fiscal years ended May 31, 1950 through 1954 were $323,366.13, $955,421.46, $1,138,748.37, $1,581,729.06 and $2,528,642.29, respectively. During these years the Goodalls, through their partnership, were in complete control of the corporation. They continually withdrew corporate funds for their own or partnership purposes during these years. The corporation's records show that as of the end of the fiscal years ended May 31, 1950 through 1954 the outstanding balances of withdrawals (shown as amounts due from officers) were $203,043.48, $273,152.58, $309,696.15 and $880,273.20, and that by May 31, 1954 the outstanding balance of corporate withdrawals was about $1,660,000. The record shows that as of June 1954, at least $1,318,000 of the corporate withdrawals were used for the operations of the Goodall Oil Co., which was operated as a division of the partnership. It thus appears that the bulk of the corporation's earnings was used for purely personal expenditures or for other ventures of the Goodalls. Such continual use of the corporate funds strongly indicates, in our opinion, that *226 its earnings and profits to this extent were not needed in the operation of the corporation's business and that such amounts were accumulated beyond its reasonable needs within the meaning of the statute. Helvering v. National Grocery Co., 304 U.S. 282. We have examined the various grounds put forth by petitioner to justify the accumulation of its earnings and profits, and we are persuaded that none of them has any merit. As to the purported expansion plans, the record merely tells us that Robert made trips in 1953 to England and to Mexico to investigate the possibility of extending operations to those countries. These trips were merely exploratory. Petitioner makes no effort to show what portion of the earnings and profits was needed for this expansion or, for that matter, that the earnings and profits accumulated in prior fiscal years were insufficient. There are no corporate minutes, nor any other specific corporate records, to show that these plans were contemplated or their scope. Moreover, the record shows that these plans *227 were dropped because of Robert's death in October 1953, some seven months before the end of the fiscal year 1954, which would certainly weaken any justification for accumulating the fiscal year 1954 earnings for such expansion purposes. As to the purported need to retain earning to meet potential renegotiation liabilities, the record shows that it was not until July 1952 that the corporation was informed by the Renegotiation Board that its fiscal year ending May 31, 1950 was to be renegotiated. (No renegotiation liability was ultimately determined for fiscal year ended May 31, 1950.) It was not until January 1954 that the corporation's fical year ended May 31, 1951 was before the Renegotiation Board and not until November 1954 (after the years here involved) that the corporation was notified of a tentative determination for the fiscal year ended May 31, 1951. (This finally involved a net repayment to the Government of $56,632.36.) Nor does it appear that the corporate management was sufficiently concerned about these future liabilities to establish a reserve for this eventuality. As for the contention that there was a need to meet income and excess profits tax liabilities, it will *228 suffice to say that the respondent did not begin his audit of these fiscal years, which are all before this Court, until about September 1953 (during the last fiscal year here involved)and that the revenue agent's report was not completed until some years later. We are convinced that neither of these purported liabilities presented either an immediate need or a reasonably anticipated need of the business that prompted the retention of the corporate earnings and profits during these years. There was no apparent need during these fiscal years to accumulate these earnings and profits for operational needs. The corporation's cash account, as indicated by financial statements in its returns, shows the amounts of $515,940.38, $685,997.36, $2,269,514.88, $1,619,636.41 and $3,198,585.98 as of May 31, 1950 through 1954, respectively. These steadily increasing inactive funds, when viewed against the background of constant withdrawals by the Goodalls, strongly indicate to us that the earnings and profits were not accumulated to meet the corporation's operational needs. Moreover, the favorable working capital position of the corporation, the nature of its current assets, and its sales pattern *229 throughout these years similarly negate the need for accumulating its earnings and profits for operational purposes. Finally, we do not believe that the accumulation of the corporation's earnings and profits were prompted by the so-called hazardous nature of its business. No reserves were set up on the corporate books to meet this particular contingency and there is no real indication that management was concerned over this hazard during the years involved. The corporation's sales during these fiscal years rose from $1,185,689.54 in the fiscal year ended May 31, 1950 to $9,629,976.14 in the fiscal year ended May 31, 1954. The pattern of sales during this period was generally upward, and the record also shows that the corporation's sales exceeded $9,000,000 in each of the fiscal years ended May 31, 1955 and 1956, after the corporation had been sold. Certainly the healthy sales record does not leave room for any real concern over the purported hazardous nature of the business. A careful examination of the whole record convinces us that the corporation's earnings and profits were permitted to accumulate during its fiscal years ended May 31, 1950 through 1954 beyond the reasonable *230 needs of its business. Under section 102(c) of the 1939 Internal Revenue Code a finding that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of its business is deemed determinative of the purpose to avoid surtax upon its shareholders, within the meaning of section 102(a) of the 1939 Internal Revenue Code, unless the corporation proves to the contrary by a clear preponderance of the evidence. Pelton Steel Casting Co. v. Commissioner, 251 F. 2d 278, affirming 28 T.C. 153. We hold that the corporation has not met its burden of proof in this respect. During the fiscal years here involved the Goodalls, through their partnership, were in complete control of the corporation and had ready access to the corporate funds. During each of the fiscal years during this period they withdrew large amounts from the corporation for their personal needs or to finance ventures which had nothing to do with the corporation. During this period of time the Goodalls were in the high income tax brackets. In their joint Federal income tax *231 returns filed for the years 1950 through 1953 the Goodalls reported income in the respective amounts of $148,275.95, $59,382.42, $49,091.08 and $391,289.94. (Clarice filed a joint return for 1953; the year of Robert's death.) The individual income tax return filed by Clarice for 1954 showed adjusted gross income of $541,987.63, while the fiduciary income tax return filed for 1954 by the estate showed taxable income of $186,028.20. No dividends were declared by the corporation during the fiscal years ended May 31, 1950 through 1954 and it is clear that this failure to pay dividends resulted in significant tax savings. It is also evident that by keeping the earnings and profits of the corporation undistributed the Goodalls were able to carry on their other ventures with corporate funds unreduced by the high personal income taxes. We hold, on the basis of the entire record, that the Good-All Electric Mfg. Co. was availed of during each of the fiscal years ended May 31, 1950 through 1954 for the purpose of preventing tax upon its shareholders within the meaning of section 102 of the 1939 Internal Revenue Code. It is clear that in computing the "undistributed section 102 net income" *232 the corporation is not entitled to a dividends-paid deduction under sections 27(b) and 102 (d)(2) of the 1939 Internal Revenue Code. The actual tax under section 102 is imposed upon the "undistributed section 102 net income," which is defined in section 102(d)(2) of the 1939 Code as "section 102 net income minus the basic surtax credit provided in section 27(b)." Section 27(b) of the 1939 Code defines "basic surtax credit" as the sum of the dividends paid during the year and certain other items. Section 27(h), however, provides that "[the] amount of any distribution * * * shall not be considered as dividends paid for the purpose of computing the basic surtax credit, unless such distribution is pro rata." It has been stipulated that a portion of the salary paid by the corporation to Clarice in each of the fiscal years ended May 31, 1950 through 1954 should be disallowed as excessive. These disallowed amounts, however, remain as taxable income to Clarice. It is obvious that these amounts cannot be considered as pro rata distributions within the meaning of section 27(h) of the 1939 Internal Revenue Code and therefore may not qualify as a dividends-paid deduction in computing the corporation's *233 undistributed section 102 net income." Respondent also disallowed a portion of the deductions claimed by Good-All Electric Mfg. Co. in each of its fiscal years ended May 31, 1950 through 1954 for rental payments it made to the partnership of R. A. and C. M. Goodall, with the explanation that the amounts disallowed were not ordinary and necessary business expenses. The rental payments disallowed in the statutory notice of deficiency were as follows: Fiscal Year
Ended
May 31
Allowed
Disallowed
1950
$28,053.38
$ 31,774.03
1951
35,501.88
98,812.13
1952
44,962.93
263,644.37
1953
64,813.01
218,340.64
1954
99,053.62
382,226.43
These payments were made under the Manufacturing and Rental Agreement under which the corporation took over the operation of the electrical products manufacturing business which had been operated by the partnership. Robert Goodall had developed the electrical products, mostly capacitors, and the partnership owned the necessary machinery and equipment for the successful manufacture of such products. It may readily be inferred from the record that the partnership had developed beneficial sales contacts. (The corporation had sales *234 of $1,185,689.54 in its first fiscal year). Important skills and "know-how"had been developed during the partnership's operation of the business. Thus when the newly activated corporation acquired the manufacturing business in May 1949 it acquired much more than the use of buildings, land, machinery and equipment. In fact, the Manufacturing and Rental Agreement recognizes this when, in fixing the payments to the partnership at 5 percent of the corporation's gross sales, it calls attention to the fact that the production of the electrical products "depends largely upon the use of machines which have been perfected by the [partnership] and upon the knowledge of the partners and their employees" and then goes on to state that "this 5% hereinafter referred to as the commission is being paid for the use of the trade name, plant and equipment formerly used by the partnership in lieu of any royalties for the privilege of manufacturing such products and for the benefit of the industrial 'know-how' of the engineers and employees of the partnership." The issue is a factual one. In Roland P. Place, 17 T.C. 199, affd. 199 F. 2d 373, this Court said that "[the] *235 basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law 'required' to pay these sums as rent." See also Southern Ford Tractor Corporation, 29 T.C. 833. Respondent introduced evidence to show that a "reasonable rental" was below the rental payments actually made by the corporation. However, the shortcomings of respondent's evidence are readily apparent. Respondent's witness computed what he regarded as a sufficient rental to yield a reasonable return on the partnership's investment in its machinery, equipment, buildings and land which were used by the corporation. But, as indicated earlier, the Manufacturing and Rental Agreement covers much more than a mere rental of these fixed and real assets, and we do not see how respondent can justifiably limit the scope of the agreement in this way. Considering the benefits obtained by the corporation under the agreement, we do not feel that payments to the partnership set at 5 percent of gross sales were at all unrealistic. The *236 large payments to the partnership in the later years are of course a direct result of the dramatic increase in the corporation's sales. This, however, does not of itself affect the amount of the deduction to which the corporation is entitled. See Stanley Imerman, 7 T.C. 1030. We find, on the basis of the whole record, that the payments made by the corporation under the Manufacturing and Rental Agreement were in fact required rental or commission payments, and were not something else paid in the guise of rent. We hold that these payments are fully deductible as ordinary and necessary business expenses during the fiscal years ended May 31, 1950 through 1954. The issues before us in Docket No. 95387, involving the income tax liability of the Estate of Robert A. Goodall for 1953, are the same as the issues involving that year in Docket No. 95388 (discussed below) and will therefore be controlled by our decision in that docket. The Estate of Robert A. Goodall (Docket No. 95387) will be entitled to a deduction under section 126(c), Internal Revenue Code of 1939, for an estate tax liability, as determined in Docket No. 72361. In Docket No. 95388, respondent determined income *237 tax deficiencies as well as additions to tax against the Estate of Robert A. Goodall and Clarice M. Goodall for the years 1950 through 1953. Our decisions with respect to these issues will be controlling in so far as these same issues also involve other years in the dockets before this Court. During the years here involved Robert and/or Clarice continually withdrew large amounts from their corporation. Respondent here contends that such withdrawals were taxable as dividend distributions, while the petitioners in the relevant dockets argue that such withdrawals were loans. Whether these withdrawals represent loans or, instead, were advances for permanent use in the nature of dividends depends upon the existence at the time of the withdrawals of an intent on the part of the shareholder that it should be paid back and on the part of the corporation to enforce such payment. In Elliott J. Roschuni, 29 T.C. 1193, affirmed per curiam 271 F. 2d 267, this Court stated that "[whether] withdrawals from a corporation represent loans or taxable distributions depends on all the facts and circumstances surrounding the transactions between the stockholders and the corporation" *238 and that "[when] the withdrawers are in substantial control of the corporation, such control invites a special scrutiny of the situation." It should be recognized at the outset that the dealings of the Goodalls (or their partnership) with the corporation were marked by great informality throughout most of the period here involved. In fact, it appears that during the first few years of the corporation's active life its operations continued to be recorded on the partnership books. Respondent points out that no notes were ever executed to cover these corporate withdrawals and that no interest was ever paid to the corporation on the outstanding balances. Respondent also calls our attention to the lax bookkeeping methods of the parties involved in keeping a record of the outstanding balances of the withdrawals from year to year. On the other hand, the record shows that the withdrawals were, from the beginning, treated by the corporation as amounts due from its officers, i.e., the Goodalls, and they so appear in the corporate balance sheets in the tax returns. There were substantial repayments throughout this entire period, and on June 2, 1954 (when the corporation was sold) Clarice *239 repaid the corporation about $1,660,000 which represented nearly all the outstanding balance of withdrawals still owed to the corporation. The bookkeeper also testified that this check was "to pay what they owed the company." We have examined all the evidence, giving due consideration to the context of the facts before us, and we conclude that the corporate withdrawals were in fact intended as loans. We hold that such withdrawals over the period here involved were not taxable as dividend distributions. The next issue is whether the partnership of R.A. and C.M. Goodall failed to make a proper election to expense intangible drilling and development cost on its 1949 partnership return. Section 29.23(m)-16(b) of Regulations 111 grants taxpayer an option to capitalize or expense intangible drilling costs and development costs. Section 29.23(m)-16(b)(4) of Regulations 111 provides the method for making the election: Any operator who incurs such costs must make a clear statement of election under this option in the return for the first taxable year beginning after December 31, 1942, in which such costs are incurred. The absence of a clear indication in such return of an election to *240 deduct as expenses intangible drilling and development costs shall be deemed to be an election to recover such costs through depletion to the extent that they are not represented by physical property, and through depreciation to the extent that they are represented by physical property. This election is binding for all subsequent years. Respondent contends that no such election was made here in 1949 to expense such costs and he has determined, for the subsequent years, that the expensing of such costs on the books and records and in the tax returns was incorrect. We agree with respondent. It is clear from this record that the partnership did incur intangible drilling costs and development costs in 1949 in connection with the Winters Lease. Robert paid $3,500 to C. A. Black on September 16, 1949 as "our share of the cost of drilling as per the contract." In the operating agreement executed on September 9, 1949, by Robert A. Goodall and Black it specifically provides that "all expenses incurred in future drilling operations and all production and operating expense including the purchase of materials and supplies for said leasehold shall be paid for by the parties hereto and their *241 successors in interest ratably in proportion to their ownership therein." Black's deposition also indicates that this was the understanding of the parties. We must reject petitioners' contention that the payments made in 1949 (principally the $3,500 payment mentioned above) were solely for an interest in the Winters Lease and were not incurred for intangible drilling and development costs. It readily appears that the partnership made no election to expense intangible drilling costs and development costs on its 1949 return and we find no such election on the return filed by the Goodalls for that year. No amended return was filed for 1949 to correct what might have been a mistake or an oversight, nor is there any persuasive evidence to show that a mistake was made by the bookkeeper or by anyone else. In fact, what evidence there is indicates that all the pertinent information for the preparation of the 1949 partnership return was given to the accountant by the Goodalls. There are no ameliorating circumstances in the record to show that the failure to expense these costs was not a final and deliberate choice by the petitioners in 1949. We have examined the cases cited by petitioners *242 covering the various portions of their argument and believe they are clearly distinguishable. In fact, some of the cases cited appear to be contrary to petitioners' arguments. We sustain the respondent on this issue. The next issue is whether legal fees in the amount of $4,118.63 incurred by the partnership in 1952 in connection with claims held by the partnership against Automatic Equipment Manufacturing Company (hereinafter called Automatic) were currently deductible expenditures or whether, as respondent contends, such fees were incurred in defending title to a capital asset, i.e., the claim, and must therefore be added to the cost basis of such asset. All of the facts relating to this claim have been stipulated. We are told that (1) during 1950 and 1951 "the partnership acquired by purchase certain claims" against Automatic, (2) bankruptcy proceedings were then pending in the United States District Court against Automatic, (3) the partnership filed the claims with the trustee in bankruptcy for allowance, (4) the sole stockholder of Automatic filed an application for allowance and classification of claims of creditors in which he requested a separate classification for the partnership's *243 claims and further requested that these claims either be denied or allowed only in the amount actually paid by the partnership, and (5) after extended proceedings in bankruptcy court, including a full trial, the United States District Court (106 F. Supp. 699) concluded that "the Goodall claims will be allowed in full and classified in the same manner as the claims of all other general creditors." Pending an appeal, the sole stockholder of Automatic offered to purchase the claims from the partnership and a "price was agreed upon and the sale was made." We think it is clear that the claims were a capital asset within the meaning of section 117(a)(1) of the 1939 Internal Revenue Code and the regulations thereunder. They were treated as a capital asset by the partnership and the gain realized from the sale of the claims was reported as a long-term capital gain in the partnership return for 1953. In Samuel Cohen, 24 T.C. 957, we said that "[the] law is clear that legal fees and litigation expenses paid to defend one's title to property are capital expenditures to *244 be added to the cost of the property and are not deductible as expenses under section 23(a)." We must reject petitioner's contentions as without merit. We sustain respondent on this issue. In Docket No. 3143-63 (Clarice M. Goodall, years 1954 through 1959) the respondent disallowed an interest deduction of $109,683.70 claimed by Clarice in 1956. This amount was paid by Clarice to the district director of internal revenue at Omaha, Nebraska, on December 29, 1956 and was characterized by her as interest on income tax deficiencies for Robert A. and Clarice M. Goodall for the years 1950, 1951, 1952 and 1953. This payment was placed by the district director in a suspense account pending the final determination of tax liability. The income tax liabilities of Robert (or the Estate) and Clarice for the years 1950 through 1953 are before the Court in this proceeding in another docket. When the payment of $109,683.70 was made, purporting to be interest on tax deficiencies for 1950 through 1953, the report of the revenue agent covering those years had not been prepared. The record shows that the report was prepared in December 1958 and was not mailed to petitioners until April 1959. This *245 issue in the case is controlled by our holding in Jacob J. Shubert, 41 T.C. 243. In that case we held that a remittance of $20,000 voluntarily made to the district director in 1955 prior to the assessment of the taxpayer's tax liability for 1948 and prior to the revenue agent's final report for 1948 did not constitute a payment of interest in 1955 with respect to the disrupted and proposed deficiency in 1948 taxes. We hold for respondent on the issue. Petitioners in this docket also argue that they are entitled to an interest deduction because of section 223 of the Revenue Act of 1964 which amended section 43 of the 1939 I.R.C.[8] The facts here do not bring the case within the terms of the amended section. Charles Leich and Company v. United States, 329 F. 2d 649 (Ct. Cl. 1964). The section clearly provides that there must be a contest of an "asserted liability" before its provisions can take effect. The Senate Finance Committee stated in its report on this section (S. Rept. No. 830, 88th Cong., 2d Sess., p. 100) that "[the] amendment provides that if a taxpayer contests an asserted liability, such as a tax assessment, but makes a payment in satisfaction *246 of this liability and the contest with respect to the liability exists after the payment, then the item involved is to be allowed as a deduction or credit in the year of the payment." We do not believe that at the end of 1956, when Clarice made the payment of purported interest to the district director, there was in existence any asserted liability against the Goodalls for the taxable years 1950 through 1953. The legislative history of section 223 of the Revenue Act of 1964 clearly indicates, we believe, that it was not intended to reach a situation like the one before us. We sustain the respondent on his issue. *247 Respondent also determined that the petitioners in several of the dockets before us were liable for additions to tax as set forth in the beginning of the opinion. Petitioners have the burden to show that these determinations of the respondent were incorrect. With the exception of the additions to tax determined by respondent in Docket No. 95388 under section 294(d)(2) of the Internal Revenue Code of 1939 for the taxable years 1951 and 1952, petitioners have neither introduced any evidence nor included any discussion on brief to show that these determinations were in error. Consequently we sustain respondent as to these issues. Section 294(d)(2) of the Internal Revenue Code of 1939 provides for an addition to tax for a substantial underestimate of estimated tax. However, this section further provides that it will not "apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter * * * in an amount at least as great as though computed * * * on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise *248 on the basis of the facts shown on his return for the preceding taxable year." (Emphasis added.) The joint income tax return filed by Robert and Clarise for 1950 showed a tax liability of $79,978.76. They made four payments of estimated tax for 1951 of $20,000 each on the following dates: March 15, 1951, June 25, 1951, September 7, 1951 and January 2, 1952. Petitioners now claim that these estimated payments on the 1951 tax were based on the income shown on their 1950 return and that they come within the statutory exception, cited above, to the penalty imposed by section 294(d)(2) of the Internal Revenue Code of 1939. We do not believe that petitioners qualify under the statutory exception, which explicitly limits its application only where "a timely payment of estimated tax within or before each quarter * * * for such taxable year", i.e., the year 1951 in the instant case, is made by the taxpayer. Petitioners' June 1951 payment, which was due on the 15th of the month, section 59(a) of the Internal Revenue Code of 1939, was clearly not a timely payment and, in view of the explicit and unambiguous statutory language, we must hold against the petitioners on this issue. Petitioners *249 also argue that for the year 1952 they are entitled to the special relief provided where estimates are made on the basis of the prior year's return. Their joint income tax return for 1951 shows an overpayment of tax for that year in the amount of $54,233.08, which was credited to their 1952 estimated tax. It thus appears that this credit toward the 1952 estimated tax was more than double the income tax liability of approximately $25,000 as shown on the 1951 income tax return. We feel that under these facts, petitioners came within the special relief granted by section 294(d)(2) of the Internal Revenue Code of 1939. Respondent's only argument is that the special relief section does not apply here because petitioners did not actually file a declaration of estimated tax for 1952. We cannot believe that, under these circumstances, the failure to file a declaration of estimated tax for 1952 showing no tax due should prevent the application of the special relief provisions. We do not believe that the statute calls for such a formalistic result. The 1951 overpayment which was credited to the 1952 estimated tax meets the statutory requirement of "timely payment" which is a prerequisite for *250 the application of the special relief provisions of section 294(d)(2) of the Internal Revenue Code of 1939. We sustain petitioners on this issue. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: ESTATE OF ROBERT A. GOODALL, Deceased, CLARICE M. GOODALL, Executrix, Docket Nos. 95387 and 3142-63; ESTATE OF ROBERT A. GOODALL, Deceased, CLARICE M. GOODALL, Executrix, and CLARICE M. GOODALL, Docket No. 95388; GOOD-ALL ELECTRIC MFG. CO., Docket No. 95458; and C. M. GOOD-ALL, Docket No. 3143-63.↩
2. Petitioner now alleges in its petition (Docket No. 72361) that "the partnership interest was not in excess of $500,000."↩
3. After 1957 the oil production in the Little Beaver Field was apparently conducted under a unitization agreement.↩
4. The January 3, 1955 liquidation agreement indicates that the Good-All stock was distributed to the estate and to Clarice on May 31, 1954 in partial liquidation of their respective interests in the partnership. ↩
5. It appears from petitioner's brief that the 25,000 shares held by Clarice were redeemed by the corporation for $257,500 and that the 275,000 shares held by the estate were sold to the five former employees for $2,832,500.↩
6. Paragraph 5(d) of the petition in Docket No. 72361 alleges that "[the] said partnership had no good will at the time of decedent's death."↩
7. Good-All Electric Mfg. Co. on May 28, 1949 took over the operation of the business from the partnership of R. A. and C. M. Goodall.↩
8. Section 43 of 1939 I.R.C. specifies in general terms the proper period in which deductions and credits may be taken. Section 223 of the Revenue Act of 1964 provides, in part, as follows: SEC. 223. TIMING OF DEDUCTIONS IN CERTAIN CASES WHERE ASSERTED LIABILITLES ARE CONTESTED. (a) Taxable Year of Deduction. - * * *
(2) Section 43 of the Internal Revenue Code of 1939 (relating to period for which deductions and credits taken) is amended by adding at the end thereof the following new sentences: "If - "(1) the taxpayer contests an asserted liability, "(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, "(3) the contest with respect to the asserted liability exists after the time of the transfer, and "(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. The preceding sentence shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States." (b) Effective Dates. - Except as provided in subsections (c) and (d) - (1) the amendment made by subsection (a)(1) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954, and (2) the amendment made by subsection (a)(2) shall apply to taxable years to which the Internal Revenue Code of 1939 applies.↩